THE STATE, EX REL. THE REPOSITORY, DIV. OF THOMPSON NEWSPAPERS, INC., APPELLEE, *v.* UNGER, JUDGE, ET AL., APPELLANTS.

[Cite as State, ex rel. The Repository, *v.* Unger (1986), 28 Ohio St. 3d 418.]

(No. 85-1718—Decided December 30, 1986.)

*Krugliak, Wilkins, Griffiths & Dougherty Co., L.P.A., Ronald W. Dougherty* and *Russ Kendig,* for appellee.

*Robert D. Horowitz,* prosecuting attorney, and *Paul A. Mastriacovo,* for appellants.

*Per Curiam.* Before addressing the primary issue in this case, we reaffirm our previous holdings that prohibition is the appropriate form of action to prevent the enforcement of an order barring the public and members of the press from the courtroom. *State, ex rel. Dayton Newspapers,* v. *Phillips* (1976), 46 Ohio St. 2d 457 [75 O.O.2d 511], paragraph one of the syllabus. A newspaper has standing to seek a writ of prohibition to prevent a trial court from enforcing an order improperly excluding the public and the news media from pretrial hearings. *Id.* at paragraph two of the syllabus.

We also note that jurisdiction is not defeated because the orders which are the subject of this action have terminated. Court hearings and trials are generally of short duration. A courtroom closure order issued in connection with a hearing or trial will normally expire before an appellate court can decide its validity. Yet, it can reasonably be assumed that appellee will be subject to a similar closure order in the future. *Press-*

---

[2] Transcripts from this proceeding were not before the court of appeals in this action. We denied appellants' motion to supplement the record on appeal because "'* * * no evidence may be received or added to the record in the appellate court which was not offered [to] and considered by the trial court from which the appeal was taken.* * *'" *Drakulich* v. *Indus. Comm.* (1940), 137 Ohio St. 82, 87 [17 O.O. 398]. Accord *State* v. *Ishmail* (1978), 54 Ohio St. 2d 402 [8 O.O.3d 405], paragraph one of the syllabus.

*Enterprise Co.* v. *Superior Court* (1986), 478 U.S. \_\_\_\_, 92 L. Ed. 2d 1, at 9. Therefore, this case is not moot since these issues are " ' "capable of repetition, yet evading review." ' " *Id.* See, also, *Globe Newspaper Co.* v. *Superior Court* (1982), 457 U.S. 596, 602-603; *State, ex rel Beacon Journal Pub. Co.,* v. *Kainrad* (1976), 46 Ohio St. 2d 349, 351 [75 O.O.2d 435]; *Foster* v. *Bd. of Elections* (1977), 53 Ohio App. 2d 213, 217 [70 O.O.3d 282].

The issue to which we now direct our attention is whether, in the factual contexts of these cases, the closure orders made by Judges Unger and Smart were valid. Although this case was brought to us on behalf of a newspaper, the rights of newspapers and other media rise no higher than those of the general public. The rights of newspapers do not occupy a special position; rather, their right to be present in the courtroom derives from their status as members of the public. *E. W. Scripps Co.* v. *Fulton* (1955), 100 Ohio App. 157, 168 [60 O.O. 147]; *Williams* v. *Stafford* (Wyo. 1979), 589 P. 2d 322, 325; *Lexington Herald Leader Co.* v. *Tackett* (Ky. 1980), 601 S.W. 2d 905, 906.

"The right to a public trial is an important, fundamental constitutional guarantee of both the United States and Ohio Constitutions." *State* v. *Lane* (1979), 60 Ohio St. 2d 112, 119 [14 O.O.3d 342]. See, also, *State* v. *Hensley* (1906), 75 Ohio St. 255, 264. This guarantee "* * * is a cornerstone of our democracy which should not be circumvented unless there are extreme overriding circumstances." *State* v. *Lane, supra,* at 119.

Section 16, Article I of the Ohio Constitution provides:

"*All courts shall be open,* and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay." (Emphasis added.)

In *State* v. *Lane, supra,* this court relied on Section 16, Article I of the Ohio Constitution and repudiated the state's efforts to conduct trials within the walls of the Southern Ohio Correctional Facility. We gave special attention to the right of the citizenry — guaranteed by the Ohio Constitution — to observe the administration of justice: "* * * The inhibition to public attendance at a trial within a prison unquestionably discourages the vast majority of the general public from attending * * *." *Id.* at 120.

The underlying premise of a public trial is that the public is a party to all criminal proceedings. Criminal cases are prosecuted in the name of the people because crimes are public wrongs affecting all members of society. Indeed, "* * * the trial of one charged with criminal conduct is for the determination of the question of whether the conduct of the defendant has violated the laws of the state enforced as a necessary part of maintaining the social order." *E. W. Scripps Co., supra,* at 161.

The right of the public to attend criminal trials is also implicit within the guarantees of the First Amendment to the United States Constitution as applied to the states through the Fourteenth Amendment. "* * *

[W]ithout the freedom to attend such trials, which people have exercised for centuries, important aspects of freedom of speech and 'of the press could be eviscerated.' *Branzburg* [v. *Hayes* (1972),] 408 U.S. [655,] at 681." *Richmond Newspapers, Inc.* v. *Virginia* (1980), 448 U.S. 555, 580. Freedom of the press includes the right to "gather, write and publish the news" including events occurring in open court. *State, ex rel. Dayton Newspapers,* v. *Phillips, supra,* at 467. The First Amendment right to open proceedings in criminal trials extends to voir dire examinations, *Press-Enterprise Co.* v. *Superior Court* (1984), 464 U.S. 501, preliminary hearings, *Press-Enterprise Co.* v. *Superior Courts, supra* (92 L. Ed. 2d 1),[3] and pretrial suppression hearings. See *State, ex rel. Dayton Newspapers,* v. *Phillips, supra; Waller* v. *Georgia* (1984), 467 U.S. 39.

Thus, although the orders that were issued by the judges in the underlying cases did not arise at trial but instead occurred at pretrial hearings, we see no reason under the Ohio Constitution to differentiate between the public's right to attend pretrial proceedings and its right to attend trials. Therefore we hold that the right to a public trial pursuant to the United States and Ohio Constitutions extends to pretrial proceedings.[4]

This right of access to court proceedings, however, is not absolute. *Globe Newpaper Co., supra,* at 606. Nevertheless, "exclusion of the public should be applied sparingly," *State* v. *Lane, supra,* at 121. The public and press can be barred from criminal proceedings only in limited circumstances. *Globe Newspaper Co., supra,* at 606. "The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. * * *" *Press-Enterprise Co.* v. *Superior Court, supra* (464 U.S.), at 510. See, also, *Press-Enterprise Co.* v. *Superior Court, supra* (92 L. Ed. 2d 1), at 11; *Richmond Newspapers Co., supra; Waller* v. *Georgia, supra.*

Appropriate deference is given to this right of access when the petitioner is given an opportunity to be heard at a proceeding where he may voice his objections. The factors to be considered at such a hearing include, but are not limited to, the nature and weight of the interest to be protected by the closure, the availability of reasonable alternatives that would protect the asserted interest without necessitating closure, and whether the restriction is drawn as narrowly as possible. See, *e.g., Globe Newspaper Co., supra; Press-Enterprise Co.* v. *Superior Court, supra* (464 U.S. 501); *Richmond Newspaper Co.* v. *Virginia, supra; Press-Enterprise*

---

[3] *Press-Enterprise Co.* v. *Superior Court* (1984), 464 U.S. 501, and *Press-Enterprise Co.* v. *Superior Court* (1986), 478 U.S. ___, 92 L. Ed. 2d 1, are separate, unrelated cases.

[4] A majority of states that have considered this issue have applied this right of access to preliminary proceedings in criminal matters. See *Press-Enterprise Co.* v. *Superior Court, supra* (92 L. Ed. 2d), at 11, fn. 3.

*Co.* v. *Superior Court, supra* (92 L. Ed. 2d 1). If the trial court finds a sufficient interest to support closure, this interest must be "* * * articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered. * * *" *Press-Enterprise Co.* v. *Superior Court, supra* (464 U.S.), at 510.

Turning now to the actions of appellants, the record demonstrates that Judge Smart did not conduct any pre-closure proceedings whatsoever. While it appears that Judge Unger entertained some argument on the motion for closure, the transcript of that proceeding is not before us. Therefore, there is no evidence that either judge determined that closure was essential to protect an overriding interest, that the closure was drawn as narrowly as possible to protect only that overriding interest, or that no viable alternatives to closure were available.

We conclude then that the closure orders issued by both Judges Unger and Smart were insufficient to satisfy the constitutional requirements of Section 16, Article I of the Ohio Constitution and the First Amendment to the United States Constitution. Accordingly, we affirm the judgment of the court of appeals.

*Judgment affirmed*
*and writ allowed.*

CELEBREZZE, C.J., SWEENEY, LOCHER, HOLMES, C. BROWN and WRIGHT, JJ., concur.

DOUGLAS, J., concurs in judgment only.

CELEBREZZE, C.J., concurring. I completely agree with the result and exemplary reasoning of our *per curiam* opinion. Unquestionably, the persuasive federal authorities cited therein compel our conclusion in these troublesome cases. The artfully written majority opinion provides a balanced solution which will not inhibit the exercise of discretion by Ohio's able trial judges; rather, its tenor will merely ensure that such discretion is responsibly made, well chronicled and consistent with the sacred guarantees of Ohio's Constitution.

Although federal law is consonant with our holding, "* * * it is well to remember that Ohio is a sovereign state and that the fundamental guaranties of the Ohio Bill of Rights have undiminished vitality. Decision here may be and is bottomed on those guaranties." *Direct Plumbing Supply Co.* v. *Dayton* (1941), 138 Ohio St. 540, 545 [21 O.O. 422]. Similarly, in *Kintz* v. *Harriger* (1919), 99 Ohio St. 240, we held, in paragraphs one and two of the syllabus: "The Constitution of Ohio, Bill of Rights, Section 16, provides, among other things, 'Every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law.' " "It is the primary duty of courts to sustain this declaration of right

and remedy, wherever the same has been wrongfully invaded." I therefore offer the following observations to illustrate the solid state law foundation[5] for our decision reached today.

Section 16, Article I of the Ohio Constitution provides, *inter alia,* that "[a]*ll courts shall be open* * * *." (Emphasis added.) The foregoing provision is identical to, or substantially similar to, those written into the majority of state constitutions.[6] These "open courts" mandates were inspired by a profound distrust of secret judicial proceedings. Indeed, it is often said that justice cannot survive behind walls of silence. The notorious excesses of the Spanish Inquisition, the abuses of the English Court of Star Chamber and the French monarchy's perverse *lettre de cachet*[7] stand as historical testimony to the fact that justice perishes when clandestine

---

[5] I offer this supplemental analysis for several reasons. These were aptly stated by the Supreme Court of Washington in *State* v. *Coe* (1984), 101 Wash. 2d 364, 373-374, 679 P. 2d 353, 359:

"* * * First, state courts have a duty to independently interpret and apply their state constitutions that stems from the very nature of our federal system and the vast differences between the federal and state constitutions and courts. Second, the histories of the United States and Washington constitutions clearly demonstrate that the protection of the fundamental rights of Washington citizens was intended to be and remains a separate and important function of our state constitution and courts that is closely associated with our sovereignty. By turning to our own constitution first we grant the proper respect to our own legal foundations and fulfill our sovereign duties. Third, by turning first to our own constitution we can develop a body of independent jurisprudence that will assist this court and the bar of our state in understanding how that constitution will be applied. Fourth, we will be able to assist other states that have similar constitutional provisions develop a principled, responsible body of law that will not appear to have been constructed to meet the whim of the moment. Finally, to apply the federal constitution before the Washington constitution would be as improper and premature as deciding a case on state constitutional grounds when statutory grounds would have sufficed, and for essentially the same reasons."

[6] See Section 13, Article I, Alabama Constitution; Section 11, Article II, Arizona Constitution; Section 6, Article II, Colorado Constitution; Section 10, Article I, Connecticut Constitution; Section 9, Article I, Delaware Constitution; Section 21, Article I, Florida Constitution; Section 18, Article I, Idaho Constitution; Section 12, Article I, Indiana Constitution; Section 14, Article I, Kentucky Constitution; Section 22, Article I, Louisiana Constitution; Section 24, Article III, Mississippi Constitution; Section 14, Article I, Missouri Constitution; Section 16, Article II, Montana Constitution; Section 13, Article I, Nebraska Constitution; Section 18, Article I, North Carolina Constitution; Section 9, Article I, North Dakota Constitution; Section 6, Article II, Oklahoma Constitution; Section 10, Article I, Oregon Constitution; Section 11, Article I, Pennsylvania Constitution; Section 9, Article I, South Carolina Constitution; Section 20, Article VI, South Dakota Constitution; Section 17, Article I, Tennessee Constitution; Section 11, Article I, Utah Constitution; Section 10, Article I, Washington Constitution; Section 17, Article III, West Virginia Constitution; Section 8, Article I, Wyoming Constitution.

[7] "* * * [T]he French monarchy's *lettre de cachet* * * * consisted of an order by a monarch which allowed the indefinite imprisonment or exile of a particular person without that person being given the opportunity to defend himself." *KFGO Radio* v. *Rothe* (N.D. 1980), 298 N.W. 2d 505, 511.

methods flourish. "* * * Democracy blooms where the public is informed and stagnates where secrecy prevails. * * *" *Phoenix Newspapers, Inc.* v. *Jennings* (1971), 107 Ariz. 557, 561, 490 P. 2d 563, 567. Further: "* * * It would seem somewhat paradoxical for the very institution which has fostered a recognition of government in the sunshine and whose pronouncements are concerned with the administration of justice to take a backward step by enshrouding its own proceedings in secret * * *." *State, ex rel. Gore Newspapers Co.,* v. *Tyson* (Fla. App. 1975), 313 So. 2d 777, 787, overruled on other grounds, *English* v. *McCrary* (Fla. 1977), 348 So. 2d 293, 299, followed, *Goldberg* v. *Johnson* (Fla. App. 1986), 485 So. 2d 1386, 1389.

While serving as a judge of the Supreme Judicial Court of Massachusetts, Justice Oliver Wendell Holmes, Jr. asserted:

"The chief advantage to the country which we can discern * * * is the security which the publicity gives for the proper administration of justice. It used to be said sometimes that the privilege was founded on the fact of the court being open to the public. * * * [T]he privilege and the access of the public to the courts stand in reason upon common ground. * * * [Citation omitted.] It is desirable that the trial of causes should take place under the public eye, not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed." *Cowley* v. *Pulsifer* (1884), 137 Mass. 392, 394, 50 Amer. Rep. 318, 320. Accord *State* v. *Hensley* (1906), 75 Ohio St. 255, 264; *State* v. *Lane* (1979), 60 Ohio St. 2d 112, 119-120 [14 O.O.3d 342].

As our instant *per curiam* opinion notes, in *State* v. *Lane* (1979), 60 Ohio St. 2d 112, 119 [14 O.O.3d 342], that same constitutional section was relied upon, in part, to repudiate the state's attempt to conduct trials within the confines of the Southern Ohio Correctional Facility. Justice Locher, writing for the court, reiterated the sacred constitutional right of the people to hold in view criminal justice proceedings: "* * * The inhibition to public attendance at a trial within a prison unquestionably discourages the vast majority of the general public from attending * * *." *Id.* at 120. "The guarantee of a public trial is a cornerstone of our democracy which should not be circumvented unless there are extreme overriding circumstances." *Id.* at 119.

Similar notions underlie civil proceedings. Our society has endured and our system of justice has become the jewel in the crown of civilization primarily because we have encouraged our citizens to settle private disputes peaceably and according to settled principles. By requiring that "* * * [a]ll courts shall be open," everyone can see that the system still works. We are thus kept ever-mindful that we should not "take the law into our own hands," and that we are "a government of laws and not of men." A guarantee of openness thus emerges from Section 16 of the Ohio

Bill of Rights with respect to the right to attend court proceedings. It applies to pretrial hearings (*State, ex rel. Dayton Newspapers, v. Phillips* [1976], 46 Ohio St. 2d 457 [75 O.O.2d 511]), and it concerns itself with both criminal (*State, ex rel. Beacon Journal Pub. Co., v. Kainrad* [1976], 46 Ohio St. 2d 349 [75 O.O.2d 435]) and civil litigation (*State, ex rel. Gore Newspapers Co., v. Tyson, supra*).[8]

Like most rights, however, it is subject to some limitation in light of competing rights and various policy considerations. For example, it would be absurd to suppose that Section 16, Article I deprives judges of the power to banish those who create physical disturbances or cause dangerous situations. It is within the inherent power of the court to preserve order and decorum in the courtroom, and to protect the rights of the parties and witnesses. "* * * The litigants are the first consideration of the court, and the judge may enforce reasonable rules to afford complete courtroom decorum * * *." *E. W. Scripps Co. v. Fulton* (1955), 100 Ohio App. 157, 168 [60 O.O. 147]. Court proceedings are not necessarily closed in the constitutional sense just because certain persons, for good cause, may be prevented from attending. The right of access to judicial proceedings is limited by both the constitutional guarantee of a fair trial and by the needs of society to preserve a mechanism for obtaining just convictions. *KFGO Radio v. Rothe* (N.D. 1980), 298 N.W. 2d 505, 513 (state attorney's inquiry open to public); *Dickinson Newspapers v. Jorgensen* (N.D. 1983), 338 N.W. 2d 72.

There are other functions of the judicial system which also do not come within the realm of the constitutional guarantee of open courts. Grand jury sessions, the exclusion of witnesses during trial, jury deliberations, conferences of collegial courts, and certain juvenile hearings are some of these. Extraordinary measures necessary to preserve the lives and safety of witnesses, efforts to protect trade secrets, and shielding youngsters from offensive testimony are additional considerations which may, in some cases, be demonstrated as overcoming the constitutional right. Certainly, incidental or collateral discussions outside the presence of the jury and conferences in chambers are not subject to public invasion by authority of Section 16 of the Ohio Bill of Rights.

My mention of some recognized exceptions to the rule of open courts is

---

[8] In this regard, Oregon Supreme Court Justice Hans Linde, concurring in *State, ex rel. Oregonian Pub. Co., v. Deiz* (1980), 289 Ore. 277, 289-290, 613 P. 2d 23, poignantly observed:

"In recent memory, the efforts to censor the New York Times, the Washington Post, and the Progressive magazine were civil cases. In the Pentagon Papers case, the government went to extraordinary lengths to involve the courts in issuing judicial orders on secret evidence. [See *United States v. New York Times Co.* (1971), 328 F. Supp. 324, 326, affirmed (1971), 403 U.S. 713; S. Unger, The Papers & The Papers 164-203.] That would not be possible in an Oregon [or Ohio] Court. In retrospect James Madison might perhaps regret that he did not think it necessary to include in the United States Constitution a text on open courts as well as a First Amendment."

not intended to be exhaustive; they are examples only. Each case involving the expulsion of courtroom spectators is to be examined in the context of its own circumstances. It must be reemphasized, however, that "* * * [t]he general rule is that the exclusion of the public should be applied sparingly," *State* v. *Lane, supra,* at 121, and "* * * [t]he courtroom doors may be closed to the general public only on a rare occasion after a determination that in no other way can justice be served," *Lexington Herald-Leader* v. *Tackett* (Ky. 1980), 601 S.W. 2d 905, 906. But, what are the rules regarding closure? First, there must be a hearing. Before closing its doors to the public, a court must make an express finding that there is a substantial probability that the right of the parties to a fair hearing or their other constitutional rights will be irreparably damaged. *Ashland Pub. Co.* v. *Asbury* (Ky. App. 1980), 612 S.W. 2d 749, 753. Those present and objecting to closure (at the time the motion for closure is considered) must be given a chance to be heard. If closure is ordered, specific findings are to be made setting forth the need for closure. Absent such findings, court proceedings must be open to the public. See *Lexington Herald-Leader* v. *Meigs* (Ky. 1983), 660 S.W. 2d 658, 663. Second, at the hearing to decide whether closure is warranted, the party who seeks the order normally carries the burden of persuasion. "* * * The burden of proof is on those who would infringe the * * * right of access, not on those who assert it. * * *" *Lexington Herald-Leader* v. *Meigs, supra,* at 663. In some few instances, however, where the public has historically been excluded — and I have mentioned some of these — the burden may shift and "* * * the public or press opposing the closure must show particular public policy reasons for access strong enough to overcome the tradition of closure." *Id.* Third, the burden on the party seeking closure is generally threefold: (a) it must be shown that the interest sought to be protected is compelling enough to necessitate the extraordinary protection of a closed courtroom; (b) it must be shown that the interest cannot be adequately protected by a less drastic alternative to closure; and (c) it must be demonstrated that it is probable that the interest desired to be preserved will indeed be protected by a closed proceeding. *Id.* See, also, *State* v. *Williams* (1983), 93 N.J. 38, 459 A. 2d 641. The foregoing guidelines are established for reasons which should be obvious and so that a reviewing court, if called upon, can decide whether the closure order is legally justified.

As applied to the present dispute, it would seem that neither Judge Unger nor Judge Smart apparently considered any measures less drastic than excluding the public and press, nor did they attempt to define the terms of their orders and why or how the litigants involved would be denied a fair hearing without the exclusion. Ordinarily the mere request of a party, without more, is not enough to legitimize an exclusion order. *E. W. Scripps Co.* v. *Fulton, supra,* at 169; *Phoenix Newspapers, Inc.* v. *Jennings, supra,* at 565. We must, instead, be ever-mindful of these admonitions of Judge Hurd, concurring in *E. W. Scripps Co.* v. *Fulton, supra,* at

178: "* * * Crime and corruption grow and thrive in darkness and secrecy. Justice thrives in the open sunlight of day. If we deny to the public and press access to courts of justice, we foster a system of jurisprudence heretofore unknown in the history of Ohio."

Since both closure orders are inadequately supported under the stringent safeguards embodied in Section 16 of the Ohio Bill of Rights, they are without legal force. Accordingly, a writ of prohibition is allowed to arrest their enforcement.