**[This opinion has been published in *Ohio Official Reports* at 78 Ohio St.3d 325.]**

CINCINNATI SCHOOL DISTRICT BOARD OF EDUCATION, APPELLANT, *v.*

HAMILTON COUNTY BOARD OF REVISION ET AL., APPELLEES.

**[Cite as *Cincinnati Bd. of Edn. v. Hamilton Cty. Bd. of Revision*,**

**1997-Ohio-212.]**

*Taxation—Real property valuation—Board of Tax Appeals' valuation of property*
*reasonable and lawful, when.*

(No. 96-934—Submitted October 31, 1996—Decided April 30, 1997.)

Appeal from the Board of Tax Appeals, Nos. 93-N-1366, 93-N-1367 and

93-N-1368.

―――――――――――

**{¶ 1}** On March 9, 1993, appellee, Gwynne Building Partners ("Gwynne") filed a real estate valuation complaint for tax year 1992 with the Hamilton County Board of Revision ("BOR"). In the complaint, Gwynne alleged that its real property, known as the Gwynne Building, had a true value of $2,200,000. In a countercomplaint, appellant, the Cincinnati School District Board of Education ("BOE"), alleged that the true value of the real property should remain at $5,760,600, as determined by the Hamilton County Auditor.

**{¶ 2}** The BOR, however, determined the true value to be $2,200,000. The BOE filed an appeal of this decision with the Board of Tax Appeals ("BTA").

**{¶ 3}** The Gwynne Building is located in downtown Cincinnati at the northeast corner of Main and Sixth Street. The Gwynne Building consists of a thirteen-story office tower, with a two-story north wing, and a two-story east annex constructed in 1913. A four-story north annex was added in 1939. The building contains 153,406 gross square feet with 116,750 net rentable square feet.

**{¶ 4}** The Gwynne Building was purchased by Gwynne in May 1992. The Gwynne partnership included ten individuals, five of whom were associated with three entities that were tenants in the Gwynne Building at the time of the purchase.

**{¶ 5}** The seller of the Gwynne Building was Sam Zell, as a trustee. Zell is a Chicago-based investor who controls an entity known as Equity Assets Management ("Equity"). In addition to other properties owned in Cincinnati, Zell also owned property on a nationwide basis. During a typical year Zell sold ten to twenty properties.

**{¶ 6}** Keith Bawolek, formerly a vice-president of Equity and head of its property disposition group, testified for Gwynne. Bawolek explained that Equity reviewed Zell's properties on a quarterly basis, and if a decision was made to sell a property, his group set the price and marketed the property. Bawolek negotiated the sale of the Gwynne Building for Zell.

**{¶ 7}** The Gwynne Building was on the market when Bawolek started work with Equity in 1990. Bawolek's files showed that seventy-five packets of information on the Gwynne Building were sent out to potential purchasers and brokers. One of the brokers contacted was Bill Maltbie, who became the selling broker. Bawolek testified that Equity never exclusively listed properties for sale, but instead entered into open listing commission agreements with brokers. As a result of Bawolek's marketing efforts, two offers were received for the Gwynne Building, one for $2,350,000 and one for $2,000,000.

**{¶ 8}** Bawolek further testified that the Gwynne Building was owned by a single-asset trust, and that no business relationship existed between Zell and Gwynne other than that of landlord and tenant. Bawolek stated that the sale was voluntary and that Zell was not acting under any duress.

**{¶ 9}** Jack Streitmarter, a Gwynne partner and president of a company that leased space in the Gwynne Building, conducted negotiations for the buyer. The lease with Streitmarter's company was coming to an end, and he was looking at

other places to move because the owner of the Gwynne Building was not putting sufficient money into improvements. Eventually, Streitmarter became interested in purchasing the Gwynne Building and submitted a bid of $4,000,000 through Maltbie. The bid was contingent upon environmental, mechanical, and structural inspections. When Streitmarter received the asbestos report he reduced his bid to $3,200,000. Later, Streitmarter withdrew his bid. In April 1992, after all the inspection reports were received, Streitmarter submitted a bid of $2,200,000, which was accepted. Prior to closing, Streitmarter assigned his interest in the purchase contract to Gwynne.

{¶ 10} The Hamilton County Auditor, although he had not filed an appeal to the BTA, presented appraisal testimony from his senior appraiser, Marlene McDaniel, in opposition to the testimony of Bawolek and Streitmarter. McDaniel valued the real property, as of January 1, 1992, at $5,390,000, using a sales comparison approach to value. Using the income approach McDaniel valued the real property at $4,600,000. Reconciling the two approaches, McDaniel valued the real property at $5,000,000 as of January 1, 1992.

{¶ 11} The BTA determined the true value of the real property was $2,200,000 as of January 1, 1992. The BOE filed a notice of appeal with this court.

{¶ 12} This cause is now before this court upon an appeal as of right.

————————————

*Wood & Lamping* and *David C. DiMuzio*, for appellant.

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Thomas J. Scheve*, Assistant Prosecuting Attorney, for appellee Hamilton County Auditor.

*Keating, Muething & Klekamp* and *Joseph L. Trauth, Jr.*, for appellee Gwynne Building Partners.

————————————

***Per Curiam.***

**{¶ 13}** The auditor did not file a notice of appeal, but in his brief as appellee he argues for reversal of the BTA's decision. *Sua sponte,* the court strikes the auditor's brief.

**{¶ 14}** The gist of the BOE's first contention is that the rebuttable presumption that sale price reflects true value arises in a valuation case only after proof that that sale was an arm's-length sale. We disagree with the BOE's contention.

**{¶ 15}** In prior decisions we have recognized a rebuttable presumption that the sale price reflects the true value of property. The first mention of this presumption was made by Justice Wright, writing for the majority in *Ratner v. Stark Cty. Bd. of Revision* (1986), 23 Ohio St.3d 59, 61, 23 OBR 192, 193, 491 N.E.2d 680, 682. In *Walters v. Knox Cty. of Bd. of Revision* (1989), 47 Ohio St.3d 23, 24, 546 N.E.2d 932, 932, Justice Wright, again writing for the majority, quoting *Ratner*, stated: "[W]e do accept the '* * * *presumption* that the sale price reflect[s] true value.' " (Emphasis *sic*.) Recently, in *Lakeside Ave. L. P. v. Cuyahoga Cty. Bd. of Revision* (1996), 75 Ohio St.3d 540, 544, 664 N.E.2d 913, 916, which was decided after the BTA issued its decision in this matter, Justice Douglas, in the majority opinion, acknowledged that "the *Ratner* majority recognized that there exists a rebuttable *presumption* that the sale price reflects true value." (Emphasis *sic*.) Thus, going into the hearing before the BTA, the rebuttable presumption that sale price reflects true value was present in favor of Gwynne. However, the burden of persuasion before the BTA was on the BOE, as the appellant. Part of the BOE's burden was to present evidence to rebut the presumption that sale price reflects true value.

**{¶ 16}** By recognizing the rebuttable presumption that the sale price reflects true value, we, consequently, have recognized that a rebuttable presumption exists that the sale has met all the requirements that characterize true value. One of the

requirements of a sale that reflects true value is that the sale was made at arm's-length. *Conalco v. Monroe Cty. Bd. of Revision* (1977), 50 Ohio St.2d 129, 4 O.O.3d 309, 363 N.E.2d 722. In *Walters* we stated that "an arm's-length sale is characterized by these elements: it is voluntary, *i.e*., without compulsion or duress; it generally takes place in an open market; and the parties act in their own self interest." *Id*., 47 Ohio St.3d at 25, 546 N.E.2d at 935.

{¶ 17} In this case the BOE, as the appellant at the BTA, disputed that the sale was an arm's-length transaction. At the hearing before the BTA, however, the BOE presented no witnesses on its behalf that might have disputed the sale. McDaniel, the auditor's witness, was the only witness contesting Gwynne's position, and as the BTA stated, her "comments came from persons who had no information about the sale."

{¶ 18} If evidence had been introduced by the BOE, or others, which had shown that the sale was not an arm's-length transaction, the rebuttable presumption that sale price reflects true value either would never have arisen or it would have disappeared. In *Ayers v. Woodward* (1957), 166 Ohio St. 138, 1 O.O.2d 377, 140 N.E.2d 401, we held in paragraph three of the syllabus:

"A presumption is a procedural device which is resorted to only in the absence of evidence by the party in whose favor a presumption would otherwise operate; and where a litigant introduces evidence tending to prove a fact, either directly or by inference, which for procedural purposes would be presumed in the absence of such evidence, the presumption never arises * * *."

{¶ 19} The concept of the burden of proof involved with a presumption is succinctly set forth in Evid. R. 301, which provides: "[A] presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast."

**{¶ 20}** The BOE cited *Tanson Holdings, Inc. v. Darke Cty. Bd. of Revision* (1996), 74 Ohio St.3d 687, 660 N.E.2d 1216, as authority for its contention that the rebuttable presumption that sale price reflects true value cannot be used until the proponent of the presumption has established that the sale was conducted at arm's-length. The BOE misunderstands *Tanson.* Tanson, as the appellant, contended that the sale price reflected true value. As the appellant seeking a reduction in value, Tanson had the burden of persuasion. The evidence in *Tanson* raised the issue of whether the sale was an arm's-length sale. Once evidence was presented that raised this issue, the presumption that sale price reflects true value disappeared, and the burden was on Tanson to show that the sale was an arm's-length sale. After reviewing the evidence, the BTA found that the transfer did not exhibit "the indices of a market sale." *Id.* at 689, 660 N.E.2d at 1218. Thus, *Tanson* does not support the BOE's contention.

**{¶ 21}** Second, the BOE contends that the BTA failed to shift the burden of proof to Gwynne after the auditor presented his appraisal evidence of true value. It is the BOE's contention that once the auditor presented his appraisal evidence, the burden shifted to Gwynne to prove its case. We disagree.

**{¶ 22}** In *Ratner, supra,* we held in the syllabus: "A review of independent appraisals based upon factors other than the sale price is appropriate where it is shown that the sale price does not reflect true value." The burden of persuasion at the BTA was always on the BOE, as appellant, to prove its right to an increase in value. See *R.R.Z. Assoc. v. Cuyahoga Cty. Bd. of Revision* (1988), 38 Ohio St.3d 198, 527 N.E.2d 874, and *Cleveland Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision* (1994), 68 Ohio St.3d 336, 626 N.E.2d 933. To prove its right to an increase in value the BOE had to prove two points. First, the BOE had to prove that the sale price did not reflect true value. To prove that point the BOE attempted to prove that the sale was not an arm's-length sale. If the BOE had proven the first point, it next had to establish the increased valuation. In this case the BOE never got beyond

the first point. Thus, consideration of the auditor's appraisal never became an issue. The BTA correctly did not consider the auditor's appraisal.

{¶ 23} Finally, the BOE contends that the property was not exposed to the open market. Again, we disagree. The BTA found that the BOE's contention was not supported by sufficient competent and probative evidence. In fact there are no facts to support the BOE's contention. The undisputed evidence in this case shows that the property was on the market for over two years and was marketed to at least seventy-five potential purchasers and brokers. One of the brokers contacted was the selling broker. As a result of Bawolek's marketing efforts, two offers, in addition to the one that was accepted, were received for the building. We will not overrule BTA's findings of fact that are based upon sufficient probative evidence. *Hawthorn Mellody, Inc. v. Lindley* (1981), 65 Ohio St.2d 47, 19 O.O.3d 234, 417 N.E.2d 1257, syllabus. This court does not "sit either as a 'super' Board of Tax Appeals or sit as a trier of fact *de novo.*" *Youngstown Sheet & Tube Co. v. Mahoning Cty. Bd. of Revision* (1981), 66 Ohio St.2d 398, 400, 20 O.O. 3d 349, 351, 422 N.E.2d 846, 848.

{¶ 24} Based on the foregoing, we find the decision of the BTA to be reasonable and lawful, and it is therefore affirmed.

*Decision affirmed.*

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

DOUGLAS, J., concurs in judgment only.

_____