[This opinion has been published in *Ohio Official Reports* at 90 Ohio St.3d 79.]

THE STATE EX REL. PLAIN DEALER PUBLISHING COMPANY *v*. GEAUGA COUNTY
COURT OF COMMON PLEAS, JUVENILE DIVISION.

THE STATE EX REL. NEW WORLD COMMUNICATIONS OF OHIO, INC. *v*. GEAUGA
COUNTY COURT OF COMMON PLEAS, JUVENILE DIVISION, ET AL.

[Cite as *State ex rel. Plain Dealer Publishing Co. v. Geauga Cty. Court of
Common Pleas, Juv. Div.*, 2000-Ohio-35.]

*Prohibition—Delinquency proceeding in juvenile court closed to the public and
news media—No qualified constitutional right of access—Juvenile
delinquency proceedings are neither presumed open nor closed—Person
seeking closure has burden of proof that closure is warranted—Abuse of
discretion shown—Writ granted.*

(Nos. 00-439 and 00-442—Submitted August 9, 2000—Decided August 11,
2000.)

IN PROHIBITION.

———————————

{¶ 1} These consolidated cases involve the propriety of a decision by
respondents, Geauga County Court of Common Pleas, Juvenile Division, and Judge
Charles E. Henry, to deny the public, including the media, access to a delinquency
proceeding in the juvenile court. Relator Plain Dealer Publishing Company ("Plain
Dealer") owns and publishes *The Plain Dealer*, a Cleveland, Ohio newspaper.
Relator New World Communications of Ohio, Inc. ("New World") owns and
operates Channel 8, a Cleveland television station. According to media reports,
including those issued by relators, the underlying juvenile delinquency proceeding
is based upon the following facts.

{¶ 2} On the night of February 18, 2000, at approximately 11:00 p.m., three
teenagers, Wesley Pearson (age nineteen), J.H. (seventeen), and Marcus Moorer

(fifteen), entered a Clark Oil gasoline station and convenience store in Chester Township, Geauga County, Ohio, to rob it. The police reported that the three teenagers also planned to kill Danielle Kovacic, the station's nineteen-year-old clerk, and her seventeen-year-old girlfriend, who was present at the station to give Kovacic a ride home, because Kovacic and her friend could identify them. Moorer shot Kovacic twice in her chest, followed her as she staggered to a back room, and then shot her once more between her eyes, killing her. Moorer also shot twice at Kovacic's friend, missing her once and grazing her slightly the other time. When Moorer ran out of bullets, he, Pearson, and J.H. took the money from the station and fled. The surviving girl identified them, and they were arrested shortly thereafter.

{¶ 3} A grand jury indicted Pearson, the nineteen-year-old teenager, on two counts of aggravated murder with death-penalty specifications and one count each of attempted aggravated murder, attempted kidnapping, and aggravated robbery. Pearson entered a plea of not guilty to the charges.

{¶ 4} Delinquency charges were filed in juvenile court against the other two teenagers, J.H. and Moorer, who, unlike Pearson, were juveniles at the time the crimes were committed. J.H. was charged with being a delinquent child because of her alleged commission of aggravated murder, attempted aggravated murder, and aggravated robbery. The Geauga County Prosecuting Attorney moved to transfer jurisdiction of the cases involving J.H. and Moorer to the General Division of the Geauga County Court of Common Pleas so that they could be tried as adults.

{¶ 5} Judge Henry closed access to the public, including the media, for the detention hearings in juvenile court concerning J.H. and Moorer and instructed the media to submit written requests for access to further proceedings involving the juveniles.

{¶ 6} On February 25, Judge Henry conducted a hearing on the requests of the media, including relators, for access to the delinquency proceedings in the J.H.

2

and Moorer cases. By the time of the hearing, the names of all three teenagers had been reported by the media, and pictures of the teenagers had appeared in newspapers and on television. At the hearing, Moorer's attorney specified that he did not object to the media being present for additional juvenile court proceedings. Moorer's counsel stated that Moorer's privacy and confidentiality concerns had "already been compromised in the media" and that "access by the media would provide more accurate information." The prosecuting attorney's office stated that it would leave the issue of closing J.H. and Moorer's juvenile delinquency proceedings to Judge Henry's discretion.

{¶ 7} J.H.'s attorney, however, objected to opening the proceedings involving J.H. to the public because he did not believe that it would be in J.H.'s "best interest to have the case tried in the newspapers." But J.H.'s attorney failed to present any evidence in support of his contention. In fact, no evidence, testimonial or otherwise, was presented by either the prosecutor, the juveniles, or the media, including relators, during Judge Henry's closure hearing.

{¶ 8} At the conclusion of the hearing, Judge Henry issued an order opening the Moorer case to the public, including the press, subject to certain local rule restrictions, and took the issue of whether to close the J.H. case under consideration.

{¶ 9} On February 29, Judge Henry ruled that "[p]ublic access to the proceedings and records of [the J.H.] case [is] denied with the exception that the complaint and substantive decisions of [the Juvenile] Court, redacted to remove identifying information, shall be made available to the public." In so ruling, Judge Henry noted that public interest in the case was "understandably intense" because it was the first allegation of murder by a local child in over twenty years. Judge Henry further noted that in the court's "institutional memory," delinquency proceedings had always been presumed closed to the public, and the most important protection afforded juveniles was the confidentiality of delinquency proceedings. Judge Henry reasoned that although he was not "concerned that public access to the

proceedings would negatively affect the *fairness* of the proceedings," he believed that the seventeen-year-old juvenile, J.H., presumed innocent of the delinquency charges until a court finding of delinquency, would suffer "self-evident" harm if her case were conducted in public. (Emphasis *sic.*) Judge Henry concluded that "[i]n weighing the competing interests in this case * * * the state's interests in protecting the juvenile from harm and in preserving the system it has created for rehabilitating its youth outweighs the public's interest in viewing these proceedings."

{¶ 10} On March 6 and 7, relators filed these actions for writs of prohibition to prevent Judge Henry and the juvenile court from enforcing their February 29, 2000 order barring the public and the press from the delinquency proceedings involving J.H. On March 9, we granted an alternative writ and issued a schedule for the presentation of evidence and briefs. 88 Ohio St.3d 1441, 724 N.E.2d 1154.

{¶ 11} We subsequently consolidated the cases and granted relators' emergency motion to amend the alternative writ so that it would also apply to the Moorer delinquency case. 88 Ohio St.3d 1455, 725 N.E.2d 672; 88 Ohio St.3d 1494, 727 N.E.2d 919. The latter amendment was necessitated by Moorer's subsequent attempt to withdraw his prior consent to open proceedings in his case. On May 2 and 3, Judge Henry held an amenability hearing in the Moorer case that was open to the public, and on May 4, he ordered that Moorer be bound over to the general division of the common pleas court to be tried as an adult. As a result of these subsequent developments, relators agreed that their claims in this case do not involve the Moorer proceedings. We denied respondents' motion to expedite a ruling in this case. 89 Ohio St.3d 1445, 731 N.E.2d 1134.

{¶ 12} This cause is now before the court for a consideration of the merits.

_____

*Baker & Hostetler L.L.P.*, *Louis A. Colombo*, *Marcia E. Marsteller* and *Jeffrey T. Williams*, for relator Plain Dealer Publishing Company.

*Walter & Haverfield, P.L.L.*, *Michael T. McMenamin*, *Frederick W. Whatley* and *Darrell A. Clay*, for relator New World Communications of Ohio, Inc.

*Bruce C. Smalheer*, for respondents.

———————————

***Per Curiam.***

{¶ 13} Relators request a writ of prohibition to prevent Judge Henry from enforcing his February 29 order denying public access to further juvenile court proceedings involving J.H., including her bindover hearing. Prohibition is the appropriate action to challenge trial court orders restricting public access to pending litigation. *State ex rel. News Herald v. Ottawa Cty. Court of Common Pleas, Juv. Div.* (1996), 77 Ohio St.3d 40, 43-44, 671 N.E.2d 5, 7-8; *State ex rel. Dayton Newspapers, Inc. v. Phillips* (1976), 46 Ohio St.2d 457, 75 O.O.2d 511, 351 N.E.2d 127, paragraphs one and two of the syllabus.

{¶ 14} Under R.C. 2151.35 and Juv.R. 27, juvenile courts have discretion to exclude the general public from juvenile proceedings. *State ex rel. Fyffe v. Pierce* (1988), 40 Ohio St.3d 8, 9, 531 N.E.2d 673, 674. Therefore, Judge Henry's decision to close the juvenile proceedings involving J.H. will be upheld unless he abused his discretion. *In re T.R.* (1990), 52 Ohio St.3d 6, 21, 556 N.E.2d 439, 453. An abuse of discretion implies an unreasonable, arbitrary, or unconscionable attitude. *Natl. City Bank, N.E. v. Beyer* (2000), 89 Ohio St.3d 152, 159, 729 N.E.2d 711, 717.

*Constitutional Right of Access*

{¶ 15} Relators initially claim that Judge Henry abused his discretion by applying the incorrect standard to determine whether closure was warranted. Relators assert that they, as members of the public, have a qualified constitutional right of access to the juvenile delinquency proceedings.

{¶ 16} The Free Speech and Free Press Clauses of the First Amendment to the United States Constitution, the analogous provisions of Section 11, Article I of

the Ohio Constitution, and the "open courts" provision of Section 16, Article I of the Ohio Constitution create a qualified right of public access to court proceedings that have historically been open to the public and in which public access plays a significantly positive role. *T.R.*, 52 Ohio St.3d 6, 556 N.E.2d 439, paragraph two of the syllabus; *State ex rel. Scripps Howard Broadcasting Co. v. Cuyahoga Cty. Court of Common Pleas, Juv. Div.* (1995), 73 Ohio St.3d 19, 20, 652 N.E.2d 179, 181; *Press-Enterprise Co. v. Superior Court* (1986), 478 U.S. 1, 8-9, 106 S.Ct. 2735, 2740-2741, 92 L.Ed.2d 1, 10-11.

**{¶ 17}** If the proceeding meets these "tests of experience and logic," the proceeding is presumed open and may be closed only by findings that closure is essential to preserve higher values and is narrowly tailored to serve an overriding interest. *Id.*, 478 U.S. at 9, 106 S.Ct. at 2740-2741, 92 L.Ed.2d at 11; *State ex rel. The Repository v. Unger* (1986), 28 Ohio St.3d 418, 421, 28 OBR 472, 475, 504 N.E.2d 37, 40. This qualified constitutional right of access and its presumption of openness apply to most criminal proceedings. *Id.*, 28 Ohio St.3d at 420-421, 28 OBR at 474-475, 504 N.E.2d at 39-40.

**{¶ 18}** Juvenile proceedings, however, do not meet these tests of experience and logic. Juvenile court proceedings have historically been closed to the public, and public access to these proceedings does not necessarily play a significant positive role in the juvenile court process. *T.R.*, 52 Ohio St.3d at 15-16, 556 N.E.2d at 449. For delinquent children, "it is the law's policy 'to hide youthful errors from the full gaze of the public and bury them in the graveyard of the forgotten past.' " *In re Gault* (1967), 387 U.S. 1, 24, 87 S.Ct. 1428, 1442, 18 L.Ed.2d 527, 544. In Ohio, we are required to liberally interpret the juvenile delinquency provisions to "protect the public interest in removing the consequences of criminal behavior and the taint of criminality from children committing delinquent acts and to substitute therefor a program of supervision, care, and rehabilitation." See R.C. 2151.01(B); cf. Juv.R. 1(B)(4).

{¶ 19} These traditional interests of confidentiality and rehabilitation prevent the public from having a qualified constitutional right of access to juvenile delinquency proceedings. See *T.R.*, 52 Ohio St.3d at 15-16, 556 N.E.2d at 449-450, where we relied on comparable factors to reject a claimed qualified constitutional right of access to juvenile court proceedings involving allegations of abuse, neglect, or dependency, or to determine the custody of a minor child. This is consistent with the holdings of other courts. *Florida Publishing Co. v. Morgan* (1984), 253 Ga. 467, 472, 322 S.E.2d 233, 238 ("[W]e are unable to conclude that there is any historically-based constitutional presumption of openness applicable to juvenile-court proceedings."); *In re J.S.* (1981), 140 Vt. 458, 466, 438 A.2d 1125, 1128; *San Bernardino Cty. Dept. of Pub. Social Serv. v. Superior Court* (1991), 232 Cal.App.3d 188, 205, 283 Cal.Rptr. 332, 343 ("[T]he First Amendment right of access does not extend to juvenile dependency proceedings."). "Given the juvenile justice system's overriding concern with protecting the juvenile offender, it is not surprising that claims for a First Amendment-based right of access to delinquency proceedings generally have been unsuccessful." See, generally, Dienes, Levine & Lind, Newsgathering and the Law (2 Ed.1999) 137, Section 3-3(a).

{¶ 20} Therefore, relators do not have a qualified constitutional right of access to J.H.'s juvenile delinquency proceedings, including the transfer hearing.

*Presumptions and Standard for Closure in Juvenile Delinquency Proceedings*

{¶ 21} In the absence of a qualified constitutional right of access to juvenile delinquency proceedings, there is no presumption of openness in these proceedings and closure need not meet the strict standard set forth in *Press-Enterprise*. *T.R.*, 52 Ohio St.3d at 17, 556 N.E.2d at 450. The issues that next arise are whether these proceedings should be presumed closed based on the previously specified considerations of confidentiality and rehabilitation, and, if not, whether the less stringent closure standard we adopted in *T.R.* for other juvenile proceedings is applicable to delinquency proceedings.

**{¶ 22}** Juvenile delinquency proceedings should not be presumed closed because many legitimate interests favor public access to these proceedings. "Allowing the public, including the press, into our courtrooms will enable society as a whole to become better acquainted with the functioning of the judicial process and the laws enacted by the General Assembly that directly impact our minor children." *State ex rel. Dispatch Printing Co. v. Lias* (1994), 68 Ohio St.3d 497, 504, 628 N.E.2d 1368, 1374. "Public access to the juvenile court process can promote informed public involvement in government and enhance public confidence in the judicial branch." *T.R.*, 52 Ohio St.3d at 16-17, 556 N.E.2d at 450; McClatchey, Media Access to Juvenile Records (1999), 16 Ga.St.L.Rev. 337, 343-345. In addition, access to juvenile delinquency proceedings could serve as a check on potential abuse of power by judges and other public officials, and publicity might prove beneficial to the juvenile and society by deterring future acts of delinquency and alerting parents to responsibilities toward their minor children. See, generally, Note, The Public Right of Access to Juvenile Delinquency Hearings (1983), 81 Mich.L.Rev. 1540, 1550, 1558; cf. *San Bernardino*, 232 Cal.App.3d at 202, 283 Cal.Rptr. at 341.

**{¶ 23}** In addition, delinquency proceedings in general, and transfer hearings in particular, bear a closer resemblance than other juvenile proceedings to criminal proceedings, which are generally open to the public. See *T.R.*, 52 Ohio St.3d at 16, 556 N.E.2d at 449 ("[T]he public arguably has an interest in delinquency proceedings which is analogous to its interest in criminal proceedings."); *United States v. A.D.* (C.A.3, 1994), 28 F.3d 1353, 1358 ("[D]elinquency proceedings * * * are closely analogous to criminal proceedings, and all the public interests in criminal proceedings * * * seem present and equally cogent here."); *In re D.R.* (1993), 63 Ohio Misc.2d 273, 278, 624 N.E.2d 1120, 1123 ("[D]uring the past twenty-five years, the procedures utilized in the adjudicatory, dispositional and post-dispositional stages of juvenile delinquency

proceedings have become ever more analogous to those of the adult criminal system.").

{¶ 24} In fact, we observed in *T.R.* that the need for confidentiality is less compelling in delinquency cases than in cases involving an abused, neglected, or dependent child because the "delinquent child is at least partially responsible for the case being in court." *T.R.*, 52 Ohio St.3d at 16, 556 N.E.2d at 459. While the foregoing statement could be viewed as inimical to the presumed innocence of minor children charged with delinquency because it treats them as if they are guilty of the charged acts, even the National Council of Juvenile and Family Court Judges has declared that the interest of confidentiality should be relaxed in juvenile proceedings:

" 'Traditional notions of secrecy and confidentiality should be re-examined and relaxed to promote public confidence in the court's work. The public has a right to know how courts deal with children and families. The court should be open to the media, interested professionals, and students and, when appropriate, the public, in order to hold itself accountable, educate others, and encourage greater community participation.' " Newsgathering and the Law, at 139, fn. 443, quoting National Council of Juvenile & Family Court Judges, Children and Family First: A Mandate for America's Courts (1995) 3.

{¶ 25} Based on the foregoing, like the abuse, neglect, dependency, and custody proceedings in juvenile courts we considered in *T.R.*, juvenile delinquency proceedings are neither presumed open nor presumed closed.

{¶ 26} After assessing the various interests regarding access to juvenile delinquency hearings, we apply the same standard that we adopted in *T.R.* and *Lias* for determining whether closure is justified. In these cases, we evaluated comparable competing interests, and other Ohio courts have since applied the *T.R.* test to determine the propriety of closing juvenile delinquency proceedings. *D.R.*; *In re N.H.* (1992), 63 Ohio Misc.2d 285, 626 N.E.2d 697.

**{¶ 27}** Therefore, under the applicable standard, a juvenile court may restrict public access to delinquency proceedings if, after hearing evidence and argument on the issue, the court finds that (1) there exists a reasonable and substantial basis for believing that public access could harm the child or endanger the fairness of the adjudication, (2) the potential for harm outweighs the benefits of public access, and (3) there are no reasonable alternatives to closure. *T.R.*, 52 Ohio St.3d 6, 556 N.E.2d 439, at paragraph three of the syllabus; *Lias*, 68 Ohio St.3d 497, 628 N.E.2d 1368, at paragraph one of the syllabus.

*Burden of Proof*

**{¶ 28}** In applying the *T.R.* and *Lias* standard to juvenile delinquency proceedings, the parties disagree on which party, if any, bears the burden of proof. Relators assert that the party seeking closure has the burden of proof regarding the *T.R.*/*Lias* factors whereas Judge Henry contends that either relators have the burden of proof because they filed motions seeking access or that no party bears the burden of proof in that the proceedings are neither presumptively open nor closed.

**{¶ 29}** Although *T.R.* and *Lias* failed to expressly hold which party has the burden of proof regarding the listed factors, it is evident that the burden is borne by the party seeking closure to the proceeding because in the absence of evidence and findings supporting those factors, the juvenile court cannot close the proceedings. In other words, if there is no evidence that there exists a reasonable and substantial basis for believing that public access could harm the child or endanger the fairness of the adjudication, that the potential for harm outweighs the benefits of public access, and that there are no reasonable alternatives to closure, a closure order is not justified. Consequently, the risk of non-persuasion is on the party seeking closure.

**{¶ 30}** This conclusion comports with the holdings of other courts. See *Ex Parte Island Packet* (1992), 308 S.C. 198, 201-202, 417 S.E.2d 575, 577-578

(accused in juvenile delinquency transfer hearing has the burden of proof to justify closure of the hearing); *State v. James* (Tenn.1995), 902 S.W.2d 911, 914.

{¶ 31} Neither of Judge Henry's contentions requires a contrary result. In fact, it was Judge Henry who initially closed all proceedings and *required* the media to file written requests for access. He could not thereby shift the burden of proof implicitly set in *T.R.* and *Lias*. Cf. *In re M.C.* (S.D.1995), 527 N.W.2d 290, 292, holding that the burden of proof normally follows the pleadings so that the party that pleads and relies upon the affirmative of an issue must carry the burden of proving the issue.

{¶ 32} Although juvenile proceedings, including delinquency proceedings, are neither presumptively open nor closed, the concept of burden of proof is distinct from rules of presumption. " '[A] *presumption* imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but *does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast*.' " (Emphasis added.) *Cincinnati School Dist. Bd. of Edn. v. Hamilton Cty. Bd. of Revision* (1997), 78 Ohio St.3d 325, 328, 677 N.E.2d 1197, 1200, quoting Evid.R. 301. The absence of a presumption does not result in a proceeding without any burden of proof.

{¶ 33} Consequently, the person seeking closure of a juvenile delinquency proceeding bears the burden of proving the existence of the factors specified in *T.R.* and *Lias*. In this case, only one person sought closure of the J.H. delinquency proceedings: J.H. Therefore, J.H. had the burden of proving that closure was warranted.

*Application of T.R./Lias Standard*

{¶ 34} Judge Henry concluded that even though there would be no danger to the fairness of the proceedings, J.H. would suffer "self-evident" harm if her case were conducted in public and that the "state's interests in protecting the juvenile

11

from harm and in preserving the system it has created for rehabilitating its youth outweighs the public's interest in viewing these proceedings."

{¶ 35} Judge Henry abused his discretion in so concluding because J.H. did not satisfy her burden of proof concerning the *T.R./Lias* factors. J.H. introduced no evidence to support her counsel's contention that it would not be in her best interest to have the case tried in the newspapers. See *News Herald*, 77 Ohio St.3d at 41, 671 N.E.2d at 6, where we emphasized in examining the propriety of a gag order in a juvenile delinquency bindover hearing that neither the state nor the juvenile's attorney "offered any evidence indicating that opening the juvenile court proceedings to the press and public would harm [the child] or jeopardize the fairness of the proceedings against him"; *Associated Press v. Bradshaw* (S.D.1987), 410 N.W.2d 577, 580 (writ of mandamus issued to compel court to admit media to juvenile delinquency bindover proceedings where court entered findings of fact and conclusions of law that were not supported by evidence in the record); *News Herald v. Ruyle* (N.D.Ohio 1996), 949 F.Supp. 519, 520-521.

{¶ 36} The "facts" relied upon by Judge Henry regarding the "self-evident" harm to J.H. and the court's "institutional memory" of presumed closure of delinquency proceedings are little more than the personal predilections of the judge that are not susceptible of judicial notice and, if accepted as appropriate, would arguably justify the closure of *all* juvenile delinquency proceedings. See *Lias*, 68 Ohio St.3d at 504, 628 N.E.2d at 1373, quoting *State ex rel. Miami Valley Broadcasting Corp. v. Kessler* (1980), 64 Ohio St.2d 165, 167, 18 O.O.3d 383, 385, 413 N.E.2d 1203, 1205, where we stated that in the absence of an active and meaningful role by the parties involved in a juvenile proceeding, the closure hearing " 'would become meaningless and the resultant decision would merely represent the personal predilections of the presiding judge.' " In fact, J.H. introduced no evidence at the closure hearing and did not intervene or submit evidence in this action. This case is thus distinguishable from *T.R.*, where the parties submitted

evidence, including testimony by a psychologist and a social worker, about the potential harm to the child from permitting the public to have access to the juvenile proceedings. 52 Ohio St.3d at 8-9, 556 N.E.2d at 443-444.

{¶ 37} Furthermore, even assuming that Judge Henry properly judicially noticed the evidence he relied upon in his closure decision, he abused his discretion in concluding that closure was warranted. Any harm to J.H. was either speculative or minimal and was outweighed by the public's interest in access to the delinquency proceedings, including the scheduled transfer hearing.

{¶ 38} In this regard, "[t]he closer the alleged delinquent is to the age of eighteen, the greater is the public's interest in access to the proceedings." *N.H.*, 63 Ohio Misc.2d at 294, 626 N.E.2d at 703; see, also, *United States v. Three Juveniles* (C.A.1, 1995), 61 F.3d 86, 92 (age of juvenile is an appropriate factor to determine propriety of closure of federal juvenile delinquency proceeding). J.H. was seventeen years old at the time the charged delinquent acts occurred.

{¶ 39} In addition, in the scheduled Crim.R. 30(A) preliminary hearing to determine if probable cause exists to believe that J.H. committed the charged offenses, there will be less opportunity to divulge confidential information or to "delve into the private relations of parents and children." Cf. *T.R.*, 52 Ohio St.3d at 16, 556 N.E.2d at 449-450. "Information which is normally considered confidential in juvenile court proceedings—such as a social history or mental examination—is not relevant to the Juv.R. 30 probable cause determination." *D.R.*, 63 Ohio Misc.2d at 277, 624 N.E.2d at 1123.

{¶ 40} Further, if the juvenile court finds probable cause that J.H. committed the charged offenses, it has a mandatory duty to transfer the case to the general division of the common pleas court so that she can be tried as an adult, and the proceedings will be presumptively open. R.C. 2151.26(B)(3). If this occurs, the need for confidentiality will dissipate.

**{¶ 41}** Finally, the public's interest in observing J.H.'s delinquency proceedings is greater due to the severity of the charged crimes. *Taylor v. State* (Ind.1982), 438 N.E.2d 275, 281 (severity of charged offenses supported trial court decision to permit public access to juvenile hearing to determine whether he should be tried as an adult); *Three Juveniles*, 61 F.3d at 92-93 (nature of alleged offense is a pertinent factor in closure decision).

**{¶ 42}** These factors—the public interest in the juvenile proceedings, J.H.'s near-adult age at the time of the alleged offenses, the minimal likelihood that the probable cause hearing will disclose confidential information of the sort specified in *T.R.*, the gravity of the charged offenses, and the fact that J.H. will be subject to mandatory bindover to adult court if probable cause is found—outweigh J.H.'s attorney's bare assertion that permitting access would not be in J.H.'s best interest.[1]

**{¶ 43}** Based on the foregoing, Judge Henry abused his discretion by closing further juvenile proceedings involving J.H. based on findings that were not supported by sufficient evidence and constituted little more than his personal predilections concerning closure of juvenile proceedings in general. Therefore, we grant relators a writ of prohibition to prevent Judge Henry and the juvenile court from barring the public and press from delinquency proceedings involving J.H.

*Writ granted.*

---

1. In so holding, we reject relators' assertion that because J.H.'s name has already been published and will be further publicized in the two proceedings against the other teenagers, J.H. cannot be harmed by opening further proceedings. Courts, including this one, have uniformly rejected these contentions. *T.R.*, 52 Ohio St.3d at 20, 556 N.E.2d at 453, quoting *In re J.S.* (1981), 140 Vt. 458, 471, 438 A.2d 1125, 1130 ("[T]his argument would let 'the news media determine which juvenile proceedings will be open to the public by turning up the volume of publicity concerning any case which strikes their fancy.' "); *Three Juveniles*, 61 F.3d at 93; *In re J.D.C.* (D.C.App.1991), 594 A.2d 70, 79; *In re Hughes Cty. Action* (S.D.1990), 452 N.W.2d 128, 132.

In addition, relators' claim that public access would help dispel public perceptions of unequal treatment regarding race, gender, and place of residence of the teenagers seems disingenuous because relators evidently failed to publicize the critical fact that Moorer's transfer hearing had been ordered open because his counsel, unlike J.H.'s attorney, initially agreed that the media should have access to such proceeding.

MOYER, C.J., RESNICK, F.E. SWEENEY, COOK and LUNDBERG STRATTON, JJ., concur.

DOUGLAS, J., concurs in judgment.

PFEIFER, J., dissents.

_____

**PFEIFER, J., dissenting.**

{¶ 44} The majority has elevated Greener's law ("Never argue with a man who buys ink by the barrel") over the thoughtful and time-tested Ohio law regarding the privacy of delinquency proceedings. The majority's message today: if the newspaper wants in, it gets in. We have moved from a point where it was in a judge's discretion whether a delinquency hearing would be private to a point where the local media decide whether the hearing is interesting enough to cover.

{¶ 45} The media should not be blamed here. They have a role and a job to perform—to provide information to the public. They cannot be faulted for attempting to carry out that duty. However, this court also has a job to do—to act as stewards of the judicial system in this state. We have a duty to see that the aspirations of our court system are achieved. In regard to juvenile courts, we are guided by R.C. 2151.01(B), which calls on courts to liberally interpret the juvenile laws "[t]o protect the public interest in removing the consequences of criminal behavior and the taint of criminality from children committing delinquent acts and to substitute therefor a program of supervision, care, and rehabilitation." R.C. 2151.35(A) allows for the exclusion of the general public "[i]n the hearing of any case." Juv.R. 27(A), promulgated by this court as part of its rule-making authority, states the same thing. Judge Henry stayed true to the intent of our juvenile justice system in making his decision. This court, however, has somehow lost its way.

{¶ 46} As it applies to J.H., the effect of the majority's holding is somewhat negligible. Her name and picture have already been published in newspapers. However, this case is not just about J.H.; it is about the unique role of our juvenile

15

courts as instruments of real rehabilitation. Yes, there are bad kids who appear in juvenile court. There are also a lot of good kids, who will become good citizens, who go through the system. There are kids whose time before a juvenile judge might seem pleasant compared to the unique justice that can be meted out by disappointed parents. Those kids we never see in court again. And those kids are the ones put in the most jeopardy by this court's ruling today.

{¶ 47} For after today, if the local newspaper wants to sit in on a delinquency hearing, it probably can. How many parents can meet the evidentiary burden placed upon them by this court? How many parents will be able to afford the psychologist and social worker the majority seems to require to testify about what we all know—that publicizing a mistake, or an alleged mistake, can be devastating to a child? The whole structure of the juvenile justice scheme is built around that premise. The majority opinion seems to mock Judge Henry's assertion that the harm of being branded a murderer is self-evident. The idea that it is somehow not self-evident is incredible.

{¶ 48} If the juvenile court finds probable cause to believe that J.H. committed the charged offenses, it must transfer her to common pleas court so that she may be tried as an adult. If this occurs, the majority writes, "the proceedings will be presumptively open" and "the need for confidentiality will dissipate." On the other hand, if the trial court does not find probable cause, the need for confidentiality is greater, but that confidentiality has been lost if the proceedings were public. Then we are left with an innocent youth who has been publicly associated with a heinous crime. Certainly, Judge Henry knew that if J.H. were bound over, the newspapers would eventually get their story. And if she were not bound over, J.H. could escape the unjustified taint of a ruthless killing.

{¶ 49} Juvenile judges are given discretion for a reason. They deal with these special cases every day. They know the public pressures and probable public responses of their communities. They know children and how they react to the

16

system, and they have had at least a chance to know a little about the accused. Judge Henry employed all of that experience and used all of that information when he made a brave decision. He ruled against an ink-stained colossus, and likely contravened the wishes of his community, when he determined that J.H. deserved to retain her childhood at least until he could determine whether there was probable cause to believe that she had committed an egregiously adult act. Judge Henry made a tough decision, not a wrong one.

**{¶ 50}** I regret that a case this important was decided on the briefs without the benefit of a court conference. An important part of how we normally decide cases, the interplay and exchange of ideas between justices, was not employed here. Regrettably, an emergency vote was called on a case that I believe marks a sea change about how we deal with juveniles in this state. In making this speedy decision my colleagues adopt their own corollary to Greener's Law—"Never make a man who buys ink by the barrel wait."