EAGLE, Appellant,

v.

FRED MARTIN MOTOR COMPANY et al., Appellees.

[Cite as *Eagle v. Fred Martin Motor Co.*, 157 Ohio App.3d 150, 2004-Ohio-829.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 21522.

Decided Feb. 25, 2004.

152

Laura K. McDowall and Rocco P. Yeargin, for appellant.

Susan K. Pritchard, for appellee Fred Martin Motor Company.

George R. Hicks, for appellee Huntington National Bank.

BATCHELDER, Judge.

{¶ 1} Appellant, Lisa Eagle, appeals from the judgment of the Summit County Court of Common Pleas, which granted the motion to stay proceedings and the motion to compel arbitration of appellee, Fred Martin Motor Company ("Fred Martin").[1] We reverse and remand for further proceedings in accordance with this opinion.

I

{¶ 2} This appeal arose from Ms. Eagle's challenge to an arbitration clause contained in the contract governing her purchase of an automobile from Fred Martin. On July 3, 2000, Ms. Eagle went to Fred Martin to purchase a used car. However, she was told by a Fred Martin Representative, who had reviewed her financial information, that she did not qualify for a purchase of a used car. Fred Martin informed her that she would nevertheless be able to purchase a new Daewoo Lanos car, and represented to her that she would be better off purchasing a Lanos because it was a good automobile with an excellent warranty. Relying on these representations, Ms. Eagle decided to purchase the Lanos. Fred Martin and Ms. Eagle entered into a purchase agreement for a 2000 Daewoo Lanos automobile.

{¶ 3} Subsequently, Ms. Eagle began to experience a number of mechanical problems with the Lanos. The most serious problem Ms. Eagle experienced with the car was the Lanos stalling while being driven, causing Ms. Eagle to lose control of the vehicle. Ms. Eagle took the car to Fred Martin on a number of separate occasions to remedy this problem, but the mechanics represented to her that they were having difficulty obtaining the parts to fix the car. Ms. Eagle continued to drive the Lanos in this unrepaired condition, until the car stopped running completely in June 2002. Ms. Eagle had the car towed to Fred Martin, where the car remained unfixed for approximately six months, while she continued to make monthly loan payments on the Lanos.

{¶ 4} Ms. Eagle picked up her car from the dealership. Shortly thereafter, the car began to experience other problems, which forced Ms. Eagle to return the car

---

1. In its order, the trial court also denied Fred Martin's motion to strike. However, the motion to strike is not at issue on appeal.

to Fred Martin once again. This time, the service department at Fred Martin presented Ms. Eagle with a repair document that she asserts contained a clause stating that Fred Martin was "disclaiming all warranties," and relieving Fred Martin of responsibility if it could not obtain the proper parts for the vehicle. Ms. Eagle avers that Fred Martin refused to fix the Lanos unless she signed this paperwork. Ms. Eagle refused to sign the paperwork, and states that she instead purchased a replacement vehicle due to the severity of the problems she was having with the Lanos.

{¶ 5} On July 1, 2002, Ms. Eagle filed a complaint for unfair and deceptive consumer sales practices and a motion for declaratory judgment against Fred Martin and the Huntington National Bank ("Huntington"). In the complaint, Ms. Eagle alleged, inter alia, that Fred Martin "committed unfair, deceptive, and unconscionable acts and practices" in violation of the Consumer Sales Practices Act, R.C. Chapter 1345.[2] Ms. Eagle also asserted in the complaint that the arbitration clause contained in the purchase contract is unconscionable and therefore unenforceable, and sought a declaratory judgment of the same.

{¶ 6} On July 17, 2002, Fred Martin filed a motion to stay proceedings and a motion to compel arbitration, pursuant to the arbitration clause contained in the purchase contract entered into by Ms. Eagle and Fred Martin. The arbitration clause in the contract states that arbitration was to be conducted by the National Arbitration Forum (the "NAF") in accordance with the NAF's Code of Procedure. On July 18, 2002, Ms. Eagle filed a motion for extension of time to respond to Fred Martin's motions, pursuant to *Harrison v. Toyota Motor Sales, U.S.A., Inc.* (Apr. 10, 2002), 9th Dist. No. 20815, 2002 WL 533478.

{¶ 7} On August 12, 2002, the common pleas court issued an order that granted Ms. Eagle's motion for leave pursuant to *Harrison*, in order to allow her more time to respond to the issue of the validity of the arbitration clause.[3] Thereafter, Ms. Eagle submitted a brief in opposition to Fred Martin's motion to stay proceedings and motion to compel arbitration, pursuant to which Fred Martin filed a response brief. On March 11, 2003, the common pleas court issued an order that granted Fred Martin's motion to stay the court proceedings and motion to compel arbitration. It is from that order that Ms. Eagle now appeals.

{¶ 8} Ms. Eagle timely appealed, asserting two assignments of error for review. As Ms. Eagle's first and second assignments of error involve similar questions of law and fact, we will address these assignments of error together.

---

2. Huntington was named as a defendant under the theory of derivative liability.

3. The court granted Ms. Eagle's motion in part, granting a 90-day extension to conduct discovery and respond, rather than 120 days.

## II

### First Assignment of Error

"The trial court erred as a matter of law in finding that the arbitration clause is enforceable."

### Second Assignment of Error

"The trial court erred in finding that the arbitration clause is enforceable even though the clause is internally inconsistent and ambiguous."

{¶ 9} In her first and second assignments of error, Ms. Eagle contends that the trial court erred when it found that the arbitration clause in the purchase contract is enforceable. Specifically, Ms. Eagle avers that the arbitration clause is unconscionable, internally inconsistent, and ambiguous. We agree.

### A. *Standard of Review*

{¶ 10} When addressing whether a trial court has properly granted motions to stay proceedings and compel arbitration, the standard of review is abuse of discretion. *Carter Steel & Fabricating Co. v. Danis Bldg. Constr. Co.* (1998), 126 Ohio App.3d 251, 254–255, 710 N.E.2d 299; *Harsco Corp. v. Crane Carrier Co.* (1997), 122 Ohio App.3d 406, 410, 701 N.E.2d 1040. An abuse of discretion suggests more than an error of law or judgment but instead implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140; *Schafer v. Schafer* (1996), 115 Ohio App.3d 639, 642, 685 N.E.2d 1302. Absent an abuse of discretion, an appellate court may not substitute is judgment for that of the trial court. *Pons v. Ohio State Med. Bd.* (1993), 66 Ohio St.3d 619, 621, 614 N.E.2d 748.

{¶ 11} However, when an appellate court is presented with purely legal questions, the standard of review to be applied is de novo. *Akron–Canton Waste Oil, Inc. v. Safety–Kleen Oil Serv., Inc.* (1992), 81 Ohio App.3d 591, 602, 611 N.E.2d 955. Under the de novo standard of review, an appellate court does not give deference to a trial court's decision. *Akron v. Frazier* (2001), 142 Ohio App.3d 718, 721, 756 N.E.2d 1258. In the instant case, Ms. Eagle does not raise issue with the underlying contract for the purchase of the vehicle; rather, she challenges only the enforceability of the arbitration clause in this contract, asserting that it is unconscionable.

{¶ 12} The issue of unconscionability is a question of law. *Bank One, NA v. Borovitz,* 9th Dist. No. 21042, 2002-Ohio-5544, 2002 WL 31312671, at ¶ 12, citing *Ins. Co. of N. Am. v. Automatic Sprinkler Corp.* (1981), 67 Ohio St.2d 91, 98, 21 O.O.3d 58, 423 N.E.2d 151. "On questions of law, the common pleas court

does not exercise discretion[,] and the court of appeal's review is plenary." *McGee v. Ohio State Bd. of Psychology* (1993), 82 Ohio App.3d 301, 305, 611 N.E.2d 902.

{¶ 13} Because the determination of whether a contract is unconscionable is a question of law for the court, a factual inquiry into the particular circumstances of the transaction in question is required. *Lightning Rod Mut. Ins. Co. v. Saffle* (Nov. 6, 1991), 9th Dist. No. 15134, 1991 WL 476511; see, also, *Ins. Co. of N. Am.*, 67 Ohio St.2d at 98, 21 O.O.3d 58, 423 N.E.2d 151. Such a determination requires a case-by-case review of the facts and circumstances surrounding the agreement. See *Burkette v. Chrysler Industries, Inc.* (1988), 48 Ohio App.3d 35, 37, 547 N.E.2d 1223; *Vincent v. Neyer* (2000), 139 Ohio App.3d 848, 854–856, 745 N.E.2d 1127. As this case involves only legal questions, we apply the de novo standard of review.

## B. The Ohio Arbitration Act

{¶ 14} Ohio's public policy encourages arbitration as a method to settle disputes. *Schaefer v. Allstate Ins. Co.* (1992), 63 Ohio St.3d 708, 711–712, 590 N.E.2d 1242; *Bellaire City Schools Bd. of Edn. v. Paxton* (1979), 59 Ohio St.2d 65, 70, 13 O.O.3d 58, 391 N.E.2d 1021; *Griffith v. Linton* (1998), 130 Ohio App.3d 746, 750–751, 721 N.E.2d 146. Additionally, a presumption arises favoring arbitration when the claim in dispute falls within the scope of the arbitration provision. *Williams v. Aetna Fin. Co.* (1998), 83 Ohio St.3d 464, 471, 700 N.E.2d 859. "Therefore, a court should give effect to an arbitration provision in a contract between the parties 'unless it may be said with positive assurance that the subject arbitration clause is not susceptible [of] an interpretation that covers the asserted dispute.' " *Harrison* at * 1, quoting *Neubrander v. Dean Witter Reynolds, Inc.* (1992), 81 Ohio App.3d 308, 311, 610 N.E.2d 1089.

{¶ 15} Revised Code Chapter 2711 authorizes direct enforcement of arbitration agreements through an order to compel arbitration pursuant to R.C. 2711.03, and indirect enforcement of such agreements pursuant to an order staying trial court proceedings under R.C. 2711.02. *Maestle v. Best Buy Co.*, 100 Ohio St.3d 330, 2003-Ohio-6465, 800 N.E.2d 7, at ¶ 14. A party may choose to move for a stay, petition for an order to proceed to arbitration, or seek both. Id. at ¶ 18. In *Maestle*, the Supreme Court of Ohio noted that a motion to compel arbitration and a motion to stay proceedings are separate and distinct procedures that serve different purposes. Id. at ¶ 17.

{¶ 16} Regarding a motion for a stay of proceedings, the trial court is required, pursuant to R.C. 2711.02, to assess the arbitrability of the action pending in court, and "upon being satisfied that the issue involved in the action is referable to arbitration under an agreement in writing for arbitration, shall * * * stay the

trial of the action until arbitration of the issue has been had in accordance with the agreement[.]" R.C. 2711.02(B). However, an arbitration clause may be found to be unenforceable on grounds existing at law or in equity for the revocation of a contract. R.C. 2711.01(A); *Pinette v. Wynn's Extended Care, Inc.*, 9th Dist. No. 21478, 2003-Ohio-4636, 2003 WL 22047686, at ¶ 7. With respect to a motion to compel arbitration, R.C. 2711.03(B) provides that "[i]f the making of the arbitration agreement or the failure to perform it is in issue * * *, the court shall proceed summarily to the trial of that issue." Accordingly, the trial court must make a determination as to the validity of the arbitration clause. *Reynolds v. Lapos Constr., Inc.* (May 30, 2001), 9th Dist. No. 01CA007780, 2001 WL 577665, quoting *ABM Farms, Inc. v. Woods* (1998), 81 Ohio St.3d 498, 501, 692 N.E.2d 574; *Harrison* at * 2. See, also, R.C. 2711.03.

{¶ 17} If the clause is vague and thus lacking specifics regarding the arbitration procedure, "the trial court is not warranted in sending the case into * * * unchartered waters" without affording the parties an opportunity to conduct discovery relating to the validity of the clause. *Harrison* at * 2. See, also, *Giltner v. Mitchell*, 9th Dist. No. 21039, 2002-Ohio-5771, 2002 WL 31387032, at ¶ 15 (clarifying the decision in *Harrison* by recognizing that discovery is required only in instances when an arbitration provision is devoid of specific details). In the instant case, Ms. Eagle did challenge the validity of the clause in front of the trial court, asserting that it is unconscionable and thus unenforceable.

{¶ 18} The Supreme Court in *Maestle* held that a trial court, in disposing of a motion to stay proceedings pending arbitration pursuant to R.C. 2711.02, is not required to hold a hearing pursuant to R.C. 2711.03 regarding a motion to compel arbitration. *Maestle* at ¶ 19. R.C. 2711.02(B) states:

"If any action is brought upon any issue referable to arbitration under an agreement in writing for arbitration, the court in which the action is pending, upon being satisfied that the issue involved in the action is referable to arbitration under an agreement in writing for arbitration, shall on application of one of the parties stay the trial of the action until the arbitration of the issue has been had in accordance with the agreement[.]"

{¶ 19} The court stated that R.C. 2711.02 does not on its face require a hearing, and therefore, the court refused to read into this section an implicit requirement for a hearing on a motion to stay proceedings. *Maestle* at ¶ 19. R.C. 2711.03(A) specifically provides that:

"*The court shall hear the parties*, and, upon being satisfied that the making of the agreement for arbitration or the failure to comply with the agreement is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the agreement." (Emphasis added.)

{¶ 20} It follows that pursuant to the plain language of R.C. 2711.03, a trial court is explicitly required to hold a hearing on a motion to compel arbitration.

{¶ 21} We observe that Fred Martin jointly filed a motion to stay proceedings and a motion to compel. It does not appear from the record that a hearing of any sort was held on either matter. To the extent that Fred Martin's motion involved a motion to stay proceedings, the matter before the trial court could be ruled upon without a hearing. However, insofar as the motion included a motion to compel arbitration, the disposition of that portion of the motion required a hearing in accordance with R.C. 2711.03. See *Maestle* at ¶ 19.

{¶ 22} Although the trial court did not properly dispose of the motion to compel arbitration by not holding a hearing on the matter, the trial court did afford Ms. Eagle the opportunity to conduct discovery and brief the issue of the validity of the arbitration clause, pursuant to which the court issued an order addressing the arbitration clause. We do note, however, that despite its order granting both motions, the trial court, as mentioned supra, did not make an explicit finding that the arbitration clause itself was either enforceable or conscionable. Rather, the court simply made a statement to the effect that Ms. Eagle did not submit enough evidence to support a finding of unconscionability. From this conclusion and the fact that the court granted Fred Martin's motions to stay and compel, we infer that the trial court's implicitly concluded that the arbitration clause is not unconscionable. Thus, on this ground we proceed to evaluate the arbitration clause, rather than ordering the trial court to hold a hearing on the issue of unconscionability.

{¶ 23} While we do not intend to contradict the mandate in R.C. 2711.03 to hold a hearing on a motion to compel, we feel that at this point in *this* particular case it is unnecessary to hold a hearing on the matter. Thus, we proceed to evaluate the arbitration clause on this legal issue of unconscionability as raised by Ms. Eagle in her first assignment of error.

## C. The Ohio Consumer Sales Practices Act

{¶ 24} The Ohio Consumer Sales Practices Act, R.C. Chapter 1345 ("CSPA"), is a remedial statute designed to compensate for traditional consumer remedies. The CSPA was modeled after the Uniform Consumer Sales Practices Act, which provides policies for protecting consumers from suppliers who engage in deceptive and unconscionable sales practices, and also encourages the development of fair consumer sales practices. *Crye v. Smolak* (1996), 110 Ohio App.3d 504, 512, 674 N.E.2d 779, citing *Thomas v. Sun Furniture & Appliance Co.* (1978), 61 Ohio App.2d 78, 81, 11 O.O.3d 26, 399 N.E.2d 567; see, also, Ohio Adm.Code 109:4-3-01(A). The CSPA proscribes the commission of unfair, deceptive, or unconsciona-

ble acts or practices by suppliers in the consumer transaction context.[4] R.C. 1345.02 through 1345.03; *Crow v. Fred Martin Motor Co.*, 9th Dist. No. 21128, 2003-Ohio-1293, 2003 WL 1240119, at ¶ 18. According to R.C. 1345.09(A), if a supplier commits an act that violates R.C. 1345.02 or 1345.03, the consumer may sue to rescind the transaction or recover his or her damages in an individual action. A consumer may also seek a declaratory judgment, an injunction, or other appropriate relief under R.C. Chapter 1345. R.C. 1345.09(D).

{¶ 25} Additionally, R.C. Chapter 1345 entrusts the Attorney General with important consumer protection powers and duties. R.C. 1345.05. Among these various powers and responsibilities are the duties to make available for public inspection judgments and opinions of Ohio courts that determine that certain acts or practices violate R.C. 1345.02 through 1345.03, and informing consumers and suppliers of acts that violate R.C. Chapter 1345. R.C. 1345.05(A)(3) through (4). Additionally, the Attorney General has the power to investigate acts and practices that have come to his or her attention. R.C. 1345.06(A). R.C. Chapter 1345 also provides a number of remedies to the Attorney General to correct a violation, if he or she believes that the remedy would be in the public interest. R.C. 1345.07(A). Particularly, R.C. 1345.07 states that the Attorney General may seek an action for declaratory judgment, injunctive relief, or a class action. R.C. 1345.07(A)(1) through (3).

{¶ 26} R.C. Chapter 1345 also provides for the right of a consumer to proceed as a private attorney general. R.C. 1345.09. Specifically, R.C. 1345.09 provides that, when a consumer commences a CSPA claim for declaratory judgment, injunction, or class action, the clerk of courts is required to mail a copy of the complaint to the Attorney General, who may intervene in the action. R.C. 1345.09(E). Additionally, this section provides that when the judgment in the action becomes final, the clerk must mail a copy of the judgment and supporting opinion to the Attorney General to include it in the public file as provided under R.C. 1345.05. Id. Furthermore, a court may award reasonable attorney fees for work reasonably performed, if the supplier is deemed to have knowingly committed an act or practice that violates R.C. Chapter 1345. R.C. 1345.09(F)(2). The purpose behind most of these types of statutory fee authorizations is to " '[encourage] * * * attorneys to represent indigent clients and to act as private attorneys general in vindicating congressional policies.' " *Turner v. Progressive Corp.* (2000), 140 Ohio App.3d 112, 118, 746 N.E.2d 702, quoting *Gagne v. Maher*

---

4. " 'Supplier' means a seller, lessor, assignor, franchisor, or other person engaged in the business of effecting or soliciting consumer transactions, whether or not the person deals directly with the consumer." R.C. 1345.01(C). A "consumer" means "a person who engages in a consumer transaction with a supplier." R.C. 1345.01(D).

(C.A.2, 1979), 594 F.2d 336, 344; see, generally, *Elder v. Fischer* (1998), 129 Ohio App.3d 209, 219, 717 N.E.2d 730.

{¶ 27} With respect to the arbitrability of CSPA claims, R.C. Chapter 1345 does not expressly preclude arbitration clauses in consumer sales contracts. *Vincent,* 139 Ohio App.3d at 852, 745 N.E.2d 1127; *Garcia v. Wayne Homes, L.L.C.* (Apr. 19, 2002), 2d Dist. No. 2001 CA 53, 2002 WL 628619, at * 14 (stating generally that statutory claims may be arbitrated). "The fact that R.C. 1345.04 confers jurisdiction upon common pleas and municipal courts in cases arising under the CSPA does not preclude arbitration of such claims." *Vincent,* 139 Ohio App.3d at 852, 745 N.E.2d 1127, citing *Stehli v. Action Custom Homes, Inc.* (Sept. 24, 1999), 11th Dist. No. 98–G–2189, 1999 WL 778382. Additionally, arbitrating a CSPA claim does not deprive the claimant of any remedies prescribed by R.C. Chapter 1345. See *Smith v. Ohio State Home Serv., Inc.* (May 25, 1994), 9th Dist. Nos. 16441 and 16445, 1994 WL 200801; *Karamol v. Continental Estates, Inc.* (Sept. 22, 2000), 6th Dist. No. WD–00–021, 2000 WL 1363195. However, the United States Supreme Court has noted that statutory claims may be arbitrated so long as the claimant "effectively may vindicate [his or her] statutory cause of action" through arbitration. *Gilmer v. Interstate/Johnson Lane Corp.* (1991), 500 U.S. 20, 28, 111 S.Ct. 1647, 114 L.Ed.2d 26. It is important to safeguard the statute's remedial and deterrent functions in the arbitration context. See id.

{¶ 28} For sake of clarification, we point out that Ms. Eagle's complaint underlying this appeal alleges that Fred Martin's actions surrounding the procurement of the motor vehicle sale and the repair thereof violate R.C. Chapter 1345. Specifically, Ms. Eagle contends in her complaint that "[i]n connection with [motor vehicle] transactions, [Fred Martin] committed unfair, deceptive, and unconscionable acts and practices in violation of R.C. 1345.02 and R.C. 1345.03[.]" These alleged unconscionable acts are to be distinguished from the unconscionability argument that Ms. Eagle raises with respect to the arbitration clause itself. While it is conceivable that a complainant may allege that an arbitration clause itself may violate R.C. Chapter 1345, Ms. Eagle does not raise her arbitration clause argument in this manner, and therefore the proper mode of analysis, per R.C. 2711.01, is under the laws of contracts, rather than R.C. Chapter 1345 itself. However, we will briefly describe those portions of the CSPA necessary to our discussion of Ms. Eagle's issue on appeal.

### D. Unconscionability

{¶ 29} Some procedures, though ostensibly providing for arbitration, are by their very nature unenforceable. See *Jones v. Fred Martin Motor Co.* (Feb. 13, 2002), 9th Dist. No. 20631, 2002 WL 219569, at * 2. Therefore, the trial court

is not warranted in sending the case into such unchartered waters. An unconscionable provision is clearly unenforceable. See *Williams,* 83 Ohio St.3d at 471–473, 700 N.E.2d 859.

{¶ 30} An unconscionable contract clause is one in which there is an absence of meaningful choice for the contracting parties, coupled with draconian contract terms unreasonably favorable to the other party. *Collins v. Click Camera & Video, Inc.* (1993), 86 Ohio App.3d 826, 834, 621 N.E.2d 1294. Thus, the doctrine of unconscionability consists of two separate concepts:

"(1) [U]nfair and unreasonable contract terms, i.e., 'substantive unconscionability,' and (2) individualized circumstances surrounding each of the parties to a contract such that no voluntary meeting of the minds was possible, i.e., 'procedural unconscionability[.]' * * * These two concepts create what is, in essence, a two-prong test of unconscionability. One must allege and prove a 'quantum' of both prongs in order to establish that a particular contract is unconscionable." (Citations omitted.) Id., 86 Ohio App.3d at 834, 621 N.E.2d 1294.

{¶ 31} Substantive unconscionability encompasses those factors that concern the contract terms themselves, and the issue of whether these terms are commercially reasonable. Id. With respect to procedural unconscionability, a court will consider factors bearing on the relative bargaining position of the contracting parties, including age, education, intelligence, business acumen, experience in similar transactions, whether the terms were explained to the weaker party, and who drafted the contract. Id., citing *Johnson v. Mobil Oil Corp.* (E.D.Mich.1976), 415 F.Supp. 264, 268. Additionally, the court should consider whether the party who claims that the terms of a contract are unconscionable was represented by counsel at the time the contract was executed. *Bushman v. MFC Drilling, Inc.* (July 19, 1995), 9th Dist. No. 2403–M, 1995 WL 434409.

{¶ 32} Arbitration clauses are unconscionable where the "clauses involved are so one-sided as to oppress or unfairly surprise [a] party." *Neubrander v. Dean Witter Reynolds, Inc.* (1992), 81 Ohio App.3d 308, 311–312, 610 N.E.2d 1089, quoting Black's Law Dictionary (5th Ed.Rev.1979) 1367. See, also, *Orlett v. Suburban Propane* (1989), 54 Ohio App.3d 127, 129, 561 N.E.2d 1066 (explicating that an unconscionable arbitration clause exists "[when with respect to the arbitration clause itself] one party has been misled as to the 'basis of the bargain,' where a severe imbalance in bargaining power exists, or where specific contractual terms are outrageous").

{¶ 33} We have previously held that where a consumer brings a CSPA claim and there exists a contract between the parties that contains an arbitration clause, the trial court must "first determine[ ] whether the contract is valid and

enforceable[,]" before submitting the parties' dispute to arbitration. *Rolling v. Ohio State Home Serv., Inc.* (July 14, 1993), 9th Dist. No. 2157, 1993 WL 261568. As we noted supra, the trial court in the instant case did not expressly conclude that the arbitration clause was conscionable or that it was valid and enforceable. However, the court did respond to Ms. Eagle's various arguments to support a finding of substantive and procedural unconscionability of the clause in the following manner:

> "[Ms. Eagle's] arguments, as contained within her Brief Opposing Fred Martin's Motion to Stay and Motion to Compel Arbitration, are without merit. Simply put, absolutely no evidence has been introduced to establish that Fred Martin somehow prevented or prohibited [Ms. Eagle] from reviewing the terms and conditions of the [p]urchase [c]ontract and/or the [a]rbitration [c]lause."

{¶ 34} In support of her first assignment of error, Ms. Eagle maintains that the arbitration clause is substantively and procedurally unconscionable and that it is against public policy. Ms. Eagle asserts that it is substantively unconscionable because it "imposes excessive costs, mandates secrecy, contains a loser pays provision, and eliminates important consumer rights[.]" Additionally, Ms. Eagle asserts that at the closing of the transaction, she was not provided with a copy of the arbitration clause or contract, and that the manner in which Fred Martin proceeded with the paperwork was procedurally unconscionable. The arbitration clause is located towards the bottom of the purchase contract in very fine print, and provides the following:

> *"JURY WAIVER AND AGREEMENT TO BINDING ARBITRATION*
>
> "The undersigned consumer and Fred Martin Motor Company, by its acceptance hereof, hereby voluntarily, knowingly, irrevocably and unconditionally waive any right to have a jury participate in resolving any dispute, whether based on contract, tort, under a statute or otherwise, and whether for money damages, penalties, or declaratory or equitable relief, between or among the undersigned and Fred Martin Motor Company, arising out of or in any way related to the contract between the parties for the purchase, lease or repair of any vehicle from or by Fred Martin Motor Company and any other related document or any relationship between the undersigned consumer and Fred Martin Motor Company.
>
> "In addition, the parties voluntarily, knowingly, irrevocably and unconditionally agree that any dispute between them, whether based on contract, tort, under a statute or otherwise, and whether for money damages, penalties or declaratory or equitable relief, shall be resolved by binding arbitration.
>
> *"The arbitration shall be conducted by the National Arbitration Forum ('NAF'), under the Code Of Procedure in effect at the time the Claim is filed. Rules and forms of the [NAF] may be obtained and Claims may be filed at*

*any [NAF] office, www.arb-forum.com, or P.O. Box 50191, Minneapolis, Minnesota 55405, telephone 1–800–474–2371.* If the NAF is unable or unwilling to act as arbitrator, we may substitute another nationally recognized, independent arbitration organization that uses a similar code of procedure. Any arbitration hearing will take place within Summit County. Judgement [sic] upon any arbitration award may be entered in any court having jurisdiction. *The arbitrator shall follow existing substantive law and applicable statutes of limitations and shall honor any Claims or privilege recognized by law. If any party requests, the arbitrator shall write an opinion containing the reasons for the award. No Claim submitted to arbitration is heard by a jury and no Claim may be brought as a class action or as a private attorney general. You will not have the right to act as a class representative or participate as a member of a class of claimants with respect to any Claim.*

"For the purposes of this Arbitration Section. 'Fred Martin Motor Company['] means its parent, subsidiaries, affiliates, licensees, predecessors, successors, assigns, and purchaser of your contract and all of their officers, directors, employees, agents, and assigns or any and all of them. Additionally, 'Fred Martin Motor Company' shall mean any third party providing benefits, services, or products in connection with the contract if, and only if, such third party is named by you as a co-defendant in any Claim you assert against us.

"If any part of this Arbitration Section is found to be invalid or unenforceable, the remainder of this Arbitration Section shall be enforceable without regard to such invalidity or unenforceability.

*"THE RESULT OF THIS ARBITRATION SECTION IS THAT, EXCEPT AS PROVIDED ABOVE, CLAIMS CANNOT BE LITIGATED IN COURT, INCLUDING SOME CLAIMS THAT COULD HAVE BEEN TRIED BEFORE A JURY, AS CLASS ACTIONS OR AS A PRIVATE ATTORNEY GENERAL ACTIONS.*

"These provisions are a material inducement to Fred Martin Motor Company to provide the goods and/or services herein described in the attached contract or in any other related documents. These provisions are incorporated by reference to the Third Party Dealer's Agreement, Purchase Order and/or Repair Order as if fully rewritten therein."

{¶ 35} We will now address each of Ms. Eagle's arguments regarding this clause in turn, addressing the arbitration clause according to the general principles of contract law. Generally, the language of a contract is to be construed in accordance with its plain and ordinary meaning. See *Karabin v. State Auto. Mut. Ins. Co.* (1984), 10 Ohio St.3d 163, 166–167, 10 OBR 497, 462 N.E.2d 403. Additionally, the document is to be read as a whole and construed most strongly against its author. "[A] court must give meaning to all provisions

of a contract if possible." *Village Station Assoc. v. Geauga Cty.* (1992), 84 Ohio App.3d 448, 452, 616 N.E.2d 1201, citing *German Fire Ins. Co. v. Roost* (1897), 55 Ohio St. 581, 585, 45 N.E. 1097. Specifically, a contract provision is not to be wholly disregarded because it is inconsistent with other provisions, unless no other reasonable construction is possible. *Village Station Assoc.*, 84 Ohio App.3d at 452, 616 N.E.2d 1201, citing *Mon–Rite Constr. Co. v. Northeast Ohio Regional Sewer Dist.* (1984), 20 Ohio App.3d 255, 259, 20 OBR 317, 485 N.E.2d 799.

{¶ 36} If a contract or term in a contract is found to be unconscionable at the time that the contract was made, a court may choose either to refuse to enforce the contract, enforce the contract without the unconscionable portion, or limit the application of the unconscionable portion to avoid an unconscionable result. R.C. 1302.15(A); *Lightning Rod Mut. Ins. Co.*, supra, citing Restatement of the Law 2d, Contracts (1981) 107, Section 208.

### i. Undisclosed Prohibitive Costs

■■■ {¶ 37} In support of her argument that the arbitration clause is substantively unconscionable, Ms. Eagle asserts that the various costs associated with the arbitration proceedings are exceedingly high. Ms. Eagle directs our attention to a number of costs associated with the arbitration process, and also provides a comparison of these costs to those associated with filing suit in the Summit County Court of Common Pleas. She maintains that her arbitration costs would be even higher, because pursuant to the NAF fee schedule, a claim over $75,000, which is called a "Large Claim" under the NAF Code of Procedure, is subject to a higher range of fees. There is indeed a clear disparity between the two sets of costs imposed by the NAF.

{¶ 38} First, Ms. Eagle points to the filing fee for a $75,000 claim, which is $750. She claims that this fee is undisclosed and is substantially larger than the filing fee in the Summit County Court of Common Pleas. Ms. Eagle also refers to other fees charged by the NAF, fees associated with amending pleadings, issuing subpoenas, a fee for a discovery order, fees for a continuance, a fee to submit post-hearing briefs, and a fee for a request for a three-hour participatory hearing, and an additional fee for written findings from such a hearing. Ms. Eagle also refers to the "monetary penalty" imposed by the NAF against large consumer claims, which effectively charges a larger consumer claim higher total fees.

■■■ {¶ 39} In *Morrison v. Circuit City Stores, Inc.* (C.A.6, 2003), 317 F.3d 646, the Sixth Circuit Court of Appeals consolidated two cases brought by former employees who sued their employers for discrimination. Both employees were required to sign a mandatory arbitration agreement as a condition to their employment, and the employees challenged the enforceability of their respective

arbitration clauses. As part of its analysis, the court addressed and found the "cost-splitting" provision [5] in one of the arbitration clauses to be unenforceable. The court stated that "[a] cost-splitting provision should be held unenforceable whenever it would have the 'chilling effect' of deterring a substantial number of potential litigants from seeking to vindicate their statutory rights." Id., 317 F.3d at 661. The court also commented on the fact that courts "charge plaintiffs initial filing fees, but they do not charge extra for in-person hearings, discovery requests, routine motions, or written decisions, costs that are all common in the world of private arbitrators." Id., 317 F.3d at 669.

{¶ 40} With respect to a court's review of prohibitive arbitration costs, the court noted the United States Supreme Court's adoption in *Green Tree Financial Corp.–Alabama v. Randolph* (2000), 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373, of a case-by-case approach. In *Green Tree,* the court held that silence of an arbitration clause with respect to costs, by itself, does not make the clause unenforceable. Id., 531 U.S. at 92, 121 S.Ct. 513, 148 L.Ed.2d 373. Rather, "[w]here * * * a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Morrison,* 317 F.3d at 659, quoting *Green Tree,* 531 U.S. at 91–92, 121 S.Ct. 513, 148 L.Ed.2d 373.

{¶ 41} The Sixth Circuit also held that "potential litigants must be given an opportunity, prior to arbitration on the merits, to demonstrate that the potential costs of arbitration are great enough to deter them and similarly situated individuals from seeking to vindicate their federal statutory rights in the arbitral forum." *Morrison,* 317 F.3d at 663. Furthermore, the court in *Morrison* advised that a reviewing court should discount the possibility that a claimant will not be required to pay costs or fees because of success on the merits in arbitration. The court reasoned so because practically speaking, a potential litigant, in making a decision on whether to bring a claim, "will be inclined to err on the side of caution, especially when the worst-case scenario would mean not only losing on their substantive claims but also the imposition of the costs of the arbitration." Id. at 665. Instead of seeking relief, in this case, where, it is alleged, that the vehicle the subject of the contract was worthless to Ms. Eagle and the warranty disavowed by Fred Martin, the consumer is caught between *Scylla* and *Charybdis,* potentially unable to obtain meaningful relief under the NAF terms and yet unable to proceed to the courts.

{¶ 42} The Supreme Court of Ohio endorsed such a case-by-case approach as that adopted by the United States Supreme Court in *Green Tree. Williams,* 83

---

5. "Cost splitting" simply means that the parties to an arbitration proceeding split the costs of arbitration equally. *Morrison,* 317 F.3d at 657, fn. 3.

Ohio St.3d at 473, 700 N.E.2d 859. In *Williams*, the appellant had filed suit claiming violations of the CSPA and Ohio Home Solicitation Sales Act. *Williams*, 83 Ohio St.3d at 466–467, 700 N.E.2d 859. The suit was based on an underlying contract for home repair services valued at $11,500, pursuant to which the appellant was also induced to obtain a home equity loan with a promissory note worth approximately $13,000 with additional fees. In affirming the trial court's determination to send the case to a jury rather than have to proceed to arbitration, the Supreme Court of Ohio stated:

"[T]he presumption in favor of arbitration should be substantially weaker in a case * * * when there are strong indications that the contract at issue is an adhesion contract, and the arbitration clause itself appears to be adhesive in nature. In this situation, there arises considerable doubt that any true agreement ever existed to submit disputes to arbitration." *Williams*, 83 Ohio St.3d at 473, 700 N.E.2d 859.

{¶ 43} The court analogized the arbitration clause in its case to a nearly identical clause assessed by a California court in *Patterson v. ITT Consumer Fin. Corp.* (1993), 14 Cal.App.4th 1659, 18 Cal.Rptr.2d 563, which the California appellate court had also found to be unconscionable and unenforceable. The Supreme Court found significant the fact that the *Patterson* court's clause required a consumer to "prepay a substantial amount of fees as a condition precedent to arbitration." *Williams*, 83 Ohio St.3d at 473, 700 N.E.2d 859.

{¶ 44} Similarly, the Tenth District Court of Appeals, addressing a CSPA claim arising from a consumer's purchase of a motor vehicle, remanded the case to the trial court to determine the issue of whether the arbitration clause in that purchase contract was unconscionable. *Battle v. Bill Swad Chevrolet, Inc.* (2000), 140 Ohio App.3d 185, 192, 746 N.E.2d 1167. In its opinion, the court noted the importance of the trial court giving special attention to consumer transactions involving such expensive products as automobiles, which are of critical importance to the consumer-buyer. Id. The court specifically stated:

"If the vehicle purchased fails to perform its basic function of providing reliable transportation, the impact on the consumer can be devastating, especially if the consumer is not a wealthy person. Transactions involving modern-day necessities such as transportation deserve especially close scrutiny before an arbitration clause is enforced by the courts." Id.

{¶ 45} In the instant case, Ms. Eagle was a single mother, making approximately $14,000 per year, and living in low-income housing, around the time that she purchased the Lanos vehicle valued at approximately $10,000. Ms. Eagle entered into a loan agreement pursuant to this purchase, for 60 payments of $312.71, amounting to roughly $18,500. Due to her problems with the Lanos, Ms. Eagle had to purchase a replacement vehicle. As of January 2003, Ms. Eagle

made approximately $21,000 per year. We agree with the Tenth District that, in consumer transactions, and especially those involving necessities such as automobiles, the trial and appellate courts should pay closer attention to the terms of the arbitration clause. See id., 140 Ohio App.3d at 191–92, 746 N.E.2d 1167. This closer scrutiny is necessary for the preservation of the protections afforded consumers through legislation such as the CSPA.

{¶ 46} We now turn to a discussion of the various NAF Code of Procedure Rules concerning arbitration costs and fees. Rule 44(A) states that a party may not file a claim or proceed with arbitration proceedings unless the filing fees are timely paid for. Additionally, this subsection provides that fees are generally not refundable. Rule 5(G) provides that "[c]onsumers involved in an arbitration with a business or other entity pay only *reasonable* arbitration fees as explained in these Rules and the Fee Schedules in Appendix C and as required by the applicable law." (Emphasis added.) We question this rule's reference to "reasonable" fees, because from our reading of the NAF Code of Procedure, there do not appear to be any guidelines in the NAF Code of Procedure for the determination of what amount of fees is "reasonable." Rather, the Code of Procedure simply provides a schedule with a list of various fees. Thus, the provision for "reasonable" fees carries little significance, and instead incorporates an element of arbitrariness into the fees a consumer claimant may face in arbitration.

{¶ 47} Ms. Eagle asserts that her damages are at least $75,000. Under the NAF Code of Procedure's fee schedule, a claim of $75,000 or higher is labeled a "Large Claim." "Large Claims" carry higher fees than "Common Claims," which are claims under $75,000. To file a claim between $75,000 and $100,000, the claimant is required to pay a filing fee of $750 plus an additional one percent of the excess over $75,000.[6] Additionally, Ms. Eagle brings to our attention a number of Large Claim fees[7] that she also asserts are excessive. Some of these fees include the following: (1) $75 for a single subpoena request[8]; (2) $150 for each discovery order; (3) $100 for a continuance request; (4) $2,500 for a document hearing, or $1,500 for an initial participatory hearing session[9]; (5) at

---

6. The fee schedule provides an increasing filing fee schedule as the claim amount further increases in value.

7. Ms. Eagle bases these fees on the conservative estimation that her claim would be between $75,000 and $100,000.

8. Ms. Eagle asserts that in this case she would require at least five subpoena requests, totaling at the least $375.

9. Ms. Eagle states that, according to her conservative estimate, the arbitration of this case would require one full day, or two-hearing sessions, because one session lasts three hours in

least \$1,250 to submit a post-hearing brief[10]; (6) a fee for an objection to the request equal to as much as the cost of the original request; and (7) between \$1,000 and \$1,250[11] for a written findings of facts, conclusions of law, or reasons for an award. Ms. Eagle asserts that a conservative estimation of the fees she would likely have to incur for an in-person arbitration with a written opinion would range between \$4,200 and \$6,000. We note that there are additional fees associated with the NAF arbitration, such as fees for a request for reopening or reconsideration, and other procedural fees that may be assessed by the NAF as well. Suffice it to say that, for virtually every piece of documentation requested by a party, a corresponding fee exists.

{¶ 48} The NAF Code of Procedure does provide a vehicle for indigent claimants to pursue a waiver of their arbitration fees. Specifically, Rule 5(H), entitled "Indigent Parties[,]" provides that "[i]n accord with Rule 45, Consumers who meet the United States federal poverty standards need not pay arbitration fees." Rule 45(A) provides:

"A. An indigent Consumer Party may request a waiver of Common Claim Filing Fees, Request Fees, Hearing Fees, or security for any arbitration, by filing with the Director a written Request for a waiver at the time payment is due. The Request for a waiver shall be accompanied by an affidavit of indigency[.] * * *

"B. The Director shall promptly determine whether a Consumer Party is eligible for a *full or partial* waiver under this Rule and under United States federal poverty standards. If the Director determines that a Consumer Party is eligible for a full or partial waiver, the Director *may* order that the business Party pay the appropriate fees." (Emphasis added.)

{¶ 49} We observe that this rule states that the director *may* order a business party to the arbitration to pay an indigent's fees. Additionally, the rule provides for either a full or partial waiver of fees for an indigent consumer claimant. Thus, not only is the waiver of an indigent consumer's fees, according to the plain language of the rule, discretionary, but the NAF Director also possesses the discretion to award less than a full waiver of such fees. Thus, under the NAF Code of Procedure, an indigent party is not necessarily guaranteed a waiver of all

duration. The cost of each additional participatory hearing session is \$1,000 for a Large Claim.

10. The cost of a request to submit a post-hearing memorandum is equal to one-half the fee of one-hearing session. Ms. Eagle cites the fee based on a documentary hearing. In the case of a one-session participatory hearing, the cost would be \$750.

11. The fee in document hearings is one-half the document hearing fee of \$2,500, and the fee in participatory hearings is the fee for one additional participatory hearing fee of \$1,000.

the fees that he or she would be required to pay in arbitration. More important-ly for the instant case, however, is the fact that Rule 5(A) does not state that Large Claim fees may be waived; rather, the rule explicitly provides only for the waiver of Common Claim fees. Because Ms. Eagle asserts that her damages are $75,000 or greater, her claim is categorized as a Large Claim under the NAF fee schedule. Thus, assuming that Ms. Eagle would even qualify for indigent status, her Large Claim fees are not expressly waivable under the NAF Code of Procedure.

{¶ 50} Assuming arguendo that the NAF Code of Procedure Rules actually provided for a mandatory full waiver of both Common and Large Claim fees, the fact that the rules would provide for such a guaranteed waiver for indigent claimants is ultimately irrelevant. Practically speaking, such arbitration costs would serve to deter even low-income persons who do not qualify for indigent status, as well. That a consumer such as Ms. Eagle, a primary caregiver for one child and who more recently made approximately $20,000 per year, would be willing and able to expend on a conservative scale between $4,000 and $6,000 on arbitration fees and costs, is highly doubtful.

{¶ 51} Based upon a review of the NAF Code of Procedure, and pursuant to the controlling precedent requiring a case-by-case analysis of such clauses, we agree with Ms. Eagle and find that these arbitration costs and fees are prohibi-tive, unreasonable, and unfair as applied to Ms. Eagle. Therefore, we conclude that based on these prohibitive costs alone, the arbitration clause in general is substantively unconscionable.

### ii. Procedural Unconscionability

{¶ 52} To support her contention that the manner in which Fred Martin presented the clause to her was procedurally unconscionable, Ms. Eagle claims that the clause was in fine print on a form contract. She maintains that the representative going through the paperwork with her hurriedly guided her through the paperwork, prompting her to sign by the "X" on each preprinted form. Also, Ms. Eagle claims that the representative did not explain the arbitration clause to her, or indicate to her that an arbitration clause existed in the contract; nor did the clause make her aware of the excessive costs. Additional-ly, Ms. Eagle asserts that at the closing of the transaction, she was not provided with a copy of the arbitration clause or contract. She maintains that the first time that she knew that her purchase contract included an arbitration clause was in the process of instituting the litigation for the instant case, and maintains that this was an unfair surprise that amounts to procedural unconscionability.

{¶ 53} In the instant case, the common pleas court did grant Ms. Eagle's motion for leave for extension of time to conduct discovery, pursuant to which

Ms. Eagle submitted a brief discussing the issue of the arbitration clause's validity. In its order granting Fred Martin's motions to stay and compel arbitration, the trial court discussed its reasons for granting the motions. Particularly, the court stated:

> "This Arbitration Clause is contained on the front page of the parties' Purchase Contract, in bold print, and [Ms. Eagle's] signature appears immediately below this Clause. * * * At no point has [Ms. Eagle] disputed the validity of her signature or the fact that the Contract contains the Arbitration Clause. Rather, [Ms.] Eagle argues that because Fred Martin did not explain the Arbitration Clause to her, that the Clause is somehow unenforceable. * * * Simply put, absolutely no evidence has been introduced to establish that Fred Martin somehow prevented or prohibited [Ms. Eagle] from reviewing the terms and conditions of the Purchase Contract and/or the Arbitration Clause."

{¶ 54} We acknowledge the well-settled principle, that, a person competent to contract who signs a written document without reading it is bound by its terms and assumes any risks attendant to the omission and cannot avoid its consequences. *Hook v. Hook* (1982), 69 Ohio St.2d 234, 238, 23 O.O.3d 239, 431 N.E.2d 667, citing *Kroeger v. Brody* (1936), 130 Ohio St. 559, 566, 5 O.O. 210, 200 N.E. 836. In this case, Ms. Eagle maintains that she was not aware that the purchase contract contained an arbitration clause until sometime later. She claims that if she were aware of the clause, she would not have signed the contract. This contract contains a separate signature line for the arbitration clause, and Ms. Eagle's signature appears on this line. However, whether or not Ms. Eagle was in fact aware of this clause at the time that she signed the contract is ultimately inconsequential in this particular case. For even had Ms. Eagle read the arbitration clause thoroughly, nothing on the face of the clause could have put her on notice of excessive, prohibitive costs associated with the arbitration.

{¶ 55} In this judgment order, the trial court distinguished the arbitration clause in the instant case from the arbitration clause in *Harrison*, supra. In *Harrison*, we found that particular arbitration clause to be unenforceable. However, upon review of the arbitration clause of this case to that in *Harrison*, we do not reach the same conclusion as the trial court did. The clause in *Harrison* actually has more similar than dissimilar characteristics when compared to the clause in this case. The clause in *Harrison*, just as in this case, was on a preprinted form and did not contain specific details concerning the arbitration process. Similarly, the clause in this case merely makes a reference to the NAF Code of Procedure and a website and address. This information provides the reader with no more information than a statement such as "[s]ee General

Manager for information regarding arbitration process[,]" as contained in the *Harrison* arbitration clause. See *Harrison* at * 2.

{¶ 56} This court has held that a preprinted sales contract containing an arbitration clause that is a condition precedent to the final sale, *without more*, fails to demonstrate unconscionability of the clause. *Harper v. J.D. Byrider of Canton*, 148 Ohio App.3d 122, 2002-Ohio-2657, 772 N.E.2d 190, at ¶ 16. However, in this case, Ms. Eagle brings to the trial court's attention additional aspects regarding the arbitration clause in this preprinted contract, which transcends the simpler fact pattern in *Harper*. Particularly, Ms. Eagle proposed to the trial court that various terms of this arbitration clause, as well as certain NAF Code of Procedure rules, which govern this arbitration clause, are unconscionable and inconsistent. Therefore, Ms. Eagle proposes a further ground for unenforceability of this arbitration clause beyond the mere fact that the clause is contained in a preprinted sales contract, distinguishing the instant case from our holding in *Harper*. In *Harper*, this court concluded that the trial court's reasoning for its finding that the arbitration clause was unconscionable and unenforceable, was not supported by the record, and insufficient to support the trial court's conclusion. *Harper* at ¶ 15. The trial court had reasoned that the clause was in preprinted form, which decreased the appellant's bargaining power; that a "meeting of the minds" may not have occurred when signing the contract; and the fact that the clause was made a condition precedent to finalizing the motor vehicle purchase. *Harper* at ¶ 15. In the instant case, the clause was included in a preprinted contract, and the clause does provide that it is a material inducement to entering into the underlying purchase contract. However, Ms. Eagle presents additional challenges to the clause that are not present in *Harper*.

{¶ 57} Preprinted purchase contracts such as the one signed by Ms. Eagle in the instant case resemble adhesion contracts. See, e.g., *Williams*, 83 Ohio St.3d at 472–473, 700 N.E.2d 859; *Harper* at ¶ 20 (Carr, J., dissenting). More important, the arbitration clause itself embodies characteristics of adhesion. Any consumer in a weaker position who engages in a transaction with Fred Martin has no actual choice about the terms of arbitration as set out by the NAF"s procedures and other terms contained in the arbitration clause itself. Black's Law Dictionary (5th Ed.1979) 38, defines an adhesion contract as a "standardized contract form offered to consumers of goods and services on essentially 'take it or leave it' basis without affording consumer realistic opportunity to bargain and under such conditions that consumer cannot obtain desired product or services except by acquiescing in form contract." *Sekeres v. Arbaugh* (1987), 31 Ohio St.3d 24, 31, 31 OBR 75, 508 N.E.2d 941 (H. Brown, J., dissenting), quoting *Wheeler v. St. Joseph Hosp.* (1976), 63 Cal.App.3d 345, 356, 133 Cal.Rptr. 775.

{¶ 58} Furthermore, in the context of sales agreements between consumers and retailers, the Supreme Court of Ohio has recognized that such arbitration clauses are subject to considerable skepticism upon review, due to the disparity in the bargaining positions of the parties. *Williams,* 83 Ohio St.3d at 472–473, 700 N.E.2d 859.

{¶ 59} Moreover, it is clear that a huge disparity in bargaining power existed between Fred Martin and Ms. Eagle. Ms. Eagle graduated from high school but did not pursue further education. At the time that Ms. Eagle purchased the Lanos, she was 23 years old, held a position as a truck dispatcher, and also performed clerical work. Prior to that position, Ms. Eagle worked as a dietary manager at a nursing home, and worked as a manager of a Blimpie's. Ms. Eagle asserts that at that point in her life, the purchase of the Lanos was the biggest purchase she had ever made. It is doubtful, considering Ms. Eagle's educational and economic background, age, sophistication, and experience, that she had sufficient knowledge about these types of transactions, let alone the awareness of the various consumer rights that she was waiving by entering into this purchase contract. In fact, Ms. Eagle stated during her deposition, that, at the time that she was signing the purchase contract, she did not even know what the term "arbitration" meant. Furthermore, Ms. Eagle was not accompanied by an attorney while she was signing the paperwork for the Lanos; nor did a Fred Martin representative explain the arbitration clause to her.

{¶ 60} In light of the various factors contributing to a huge disparity in bargaining power and the element of unfair surprise, we must conclude that Fred Martin's arbitration clause is procedurally unconscionable as applied to Ms. Eagle. See, generally, Feingold, Policy Essay: Mandatory Arbitration: What Process is Due? (2002), 39 Harv. J. on Legis. 281 (discussing the various arbitration abuses, including those in which the bargaining power is inherently unequal).

### iii. Secrecy and Elimination of Consumer Rights

{¶ 61} Ms. Eagle also contends that the arbitration clause is substantively unconscionable because the NAF Code of Procedure requires plaintiffs to submit to "a secretive system of dispute resolution, and deprives plaintiffs of their right to an open, reviewable system of dispute resolution." Ms. Eagle asserts that this confidentiality clause limits her First Amendment right to free speech. Furthermore, Ms. Eagle maintains that the clause is unconscionable, ambiguous, and inconsistent, because it claims to honor substantive law and any claims or privilege while simultaneously expressly negating a consumer's right to bring a claim as a class action or as a private attorney general in arbitration.

{¶ 62} With respect to her argument that the confidentiality clause limits her right to free speech, Ms. Eagle cites no authority that stands for the proposition

that the confidentiality of arbitration violates a person's right to free speech. However, because we find that the confidentiality clause and the negation of the right to proceed through class action or as a private attorney general are both against the public policy underlying the purpose of the CSPA, we agree with Ms. Eagle that these factors make those portions of the clause unenforceable.

{¶ 63} A refusal to enforce a contract on the grounds of public policy may be distinguished from a finding of unconscionability. Rather than focus on the relationship between the parties and the effect of the agreement upon them, public policy analysis requires the court to consider the impact of such arrangements upon society as a whole.

{¶ 64} A contract injurious to the interests of the state will not be enforced. *King v. King* (1900), 63 Ohio St. 363, 372, 59 N.E. 111. 17 Ohio Jurisprudence 3d (1980) 528, Contracts, Section 94, states that:

"* * * Public policy is the community common sense and common conscience, extended and applied throughout the state to matters of public morals, health, safety, welfare, and the like. Again, public policy is that principle of law which holds that no one can lawfully do that which has a tendency to be injurious to the public or against the public good. Accordingly, contracts which bring about results which the law seeks to prevent are unenforceable as against public policy. Moreover, actual injury is never required to be shown; it is the tendency to the prejudice of the public's good which vitiates contractual relations." (Footnotes omitted.)

{¶ 65} In the 1980s, the United States Supreme Court issued a number of cases interpreting the Federal Arbitration Act, 9 U.S.C. 1–14. The court stated that the Act creates a "liberal federal policy favoring arbitration[.]" *Moses H. Cone Mem. Hosp. v. Mercury Constr.* (1983), 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765. Pursuant to the court's tilt towards arbitration, arbitration clauses have become a popular and standard part of consumer agreements. Miller, Consumer Law: Arbitration Clauses in Consumer Contracts: Building Barriers to Consumer Protection (1999), 78 MI Bar J. 302. Although such arbitration clauses provide a fast and cost-effective method for resolving disputes for businesses, these clauses leave consumers, often unfamiliar with the concepts of arbitration, left alone to its details and its effect on their ability to protect themselves from unfair deceptive practices. See Bautista, *Recent Dev. Harris v. Green Tree Financial Corp.* (1999), 15 Ohio St.J. on Disp.Resol. 323, 333. These arbitration clauses are many times contained on preprinted adhesion contracts, and are written in small, hard-to-read print; they are also largely unread by consumers. Assuming even that a consumer reads through an arbitration clause, this is, as a practical matter, to no avail for a consumer, because, in large part, terms in such clauses and the standardized contracts in which they are contained are largely non-negotiable.

{¶ 66} While for many businesses arbitration provides a confidential form of economical and speedy dispute resolution, this advantage ultimately serves to suppress the purpose of a remedial statute such as the CSPA. Court proceedings, by being open to the public and the media, advance the purpose of remedial consumer statutes such as the CSPA. That is, public access to court proceedings helps society become aware of unfair business acts and practices, educating consumers and thereby discouraging such activities. Conversely, arbitration proceedings, which are usually private, prevent the public from discovering such violative acts and practices. Miller, 78 MI Bar J. at 303.

"The Free Speech and Free Press Clauses of the First Amendment to the United States Constitution, the analogous provisions of Section 11, Article I of the Ohio Constitution, and the 'open courts' provision of Section 16, Article I of the Ohio Constitution create a qualified right of public access to court proceedings that have historically been open to the public and in which public access plays a significantly positive role." *State ex rel. Plain Dealer Publishing Co. v. Geauga Cty. Court of Common Pleas, Juv. Div.* (2000), 90 Ohio St.3d 79, 82, 734 N.E.2d 1214, citing *In re T.R.* (1990), 52 Ohio St.3d 6, 556 N.E.2d 439, paragraph two of the syllabus.

{¶ 67} We recognize that generally arbitration forums should be treated differently from courts. See, generally, *In re Internatl. Arbitral Award* (E.D.N.Y. 1999), 64 F.Supp.2d 183, 184 (stating that "[c]ourts have obligations to the public that private arbitrators do not"). However, where a consumer's CSPA claim is subject to binding arbitration, limitations on a consumer's right of redress and the public's access to vital consumer information should not be allowed by a private arbitration forum.

{¶ 68} When an arbitration clause vanquishes the remedial purpose of a statute by imposing arbitration costs and preventing actions from being brought by consumers, the arbitration clause should be held unenforceable. See *Randolph v. Green Tree Financial Corp.* (C.A.11, 1999), 178 F.3d 1149, 1156, citing *Gilmer v. Interstate/Johnson Lane Corp.* (1991), 500 U.S. 20, 28, 111 S.Ct. 1647, 114 L.Ed.2d 26. See, also, *Ting v. AT&T* (C.A.9, 2003), 319 F.3d 1126, 1151–1152 (recognizing that confidentiality provisions in arbitration clauses usually favor companies over individuals, and holding that a district court did not err in finding the secrecy provision therein unconscionable); *Pennzoil Co. v. Arnold Oil* (Tex. App.2000), 30 S.W.3d 494, 502 (Hardberger, C.J., concurring) (acknowledging that consumers are disadvantaged by arbitrations, that, among other things, are expensive and provide for secrecy of proceedings); *State ex rel. Dunlap v. Berger* (2002), 211 W.Va. 549, 567 S.E.2d 265, paragraph four of the syllabus (holding that provisions in an adhesive agreement that impose unreasonably burdensome costs upon or would substantially deter a person from seeking to enforce state-

afforded rights and protections or obtain statutory relief and remedies existing for the protection of the public are unconscionable).

{¶ 69} Ms. Eagle contends that under the NAF Code of Procedure, she would be prohibited from speaking about her experience to anyone else, and that this is substantively unfair and unconscionable. Ms. Eagle cites NAF Rule 4, which provides:

"Arbitration proceedings are confidential, unless all Parties agree otherwise. Arbitration Orders and Awards are not confidential. A Party who improperly discloses confidential information shall be subject to Sanctions. The Arbitrator and Forum may disclose case filings, case dispositions, and other case information as required by applicable law."

{¶ 70} We do acknowledge that Rule 5(L) of the NAF Code of Procedure provides that "[a]rbitration information may be made public in accord with Rule 4 or as required by applicable law." However, NAF Rule 37(G) explicitly pronounces that an arbitration award "shall not include any reasons, findings of fact or conclusions of law unless required by prior written agreement of the Parties or requested in writing by a Party before the beginning of any Hearing." Thus, arbitrators are expressly forbidden in their awards from articulating any conclusions and reasons, which consequently prohibits arbitrators from making any statements in their award regarding the acts and practices of the supplier involved in the arbitration, the very type of information that the CSPA seeks to disseminate to the public.

{¶ 71} While a consumer may request written findings of fact, conclusions of law, or reasons for the award, a requesting consumer who asserts a claim of more than $75,000, is required, under the NAF Code of Procedure Schedule Fee Schedule (Appendix C to the Code) to pay an *additional* fee of $1,250.[12] Thus, if Ms. Eagle's CSPA claim proceeded to arbitration, she would initially be precluded from sharing information with anyone regarding the subject matter of the arbitration, which necessarily would include any information about any allegedly violative acts and practices. Moreover, even if Ms. Eagle were to obtain an award or order against Fred Martin in arbitration, this award and order would be restricted from including any information about any acts or practices found to be in violation of CSPA or other statute or regulation. Furthermore, to obtain findings of fact or conclusions of law explicating any such information, assuming her claim is indeed at least $75,000, she would be required to pay an additional $1,250 above and beyond the slew of fees we have already discussed. Such a

---

12. The NAF schedule provides that this additional fee is equal to one-half the document hearing fee, which for a claim ranging from $75,000 to $100,000, is $2,500. The schedule provides for increasing fee amounts for such a document hearing fee as the amount of the claim increases even further.

confidentiality provision is ultimately prohibitive, not only in terms of public access restrictions, but also in regards to cost.

{¶ 72} We find that such a clause serves to restrict the Attorney General's responsibilities and powers, under the CSPA, to make public information about suppliers' acts and practices in violation of the statute, thus impeding the remedial function of the CSPA. Thus, this confidentiality clause on its face brings about a result that the CSPA seeks to prevent, namely the failure to inform the public about suppliers' deceptive and unconscionable acts in an effort to correct these wrongs. See *Crye*, 110 Ohio App.3d at 512, 674 N.E.2d 779, citing *Thomas*, 61 Ohio App.2d at 81, 11 O.O.3d 26, 399 N.E.2d 567; 17 Ohio Jurisprudence 3d (1980) 528, Contracts, Section 94, supra.

{¶ 73} Additionally, by expressly eliminating a consumer's right to proceed through a class action or as a private attorney general in arbitration, the arbitration clause directly hinders the consumer protection purposes of the CSPA. The importance of such procedures was expressed by the United States Supreme Court as follows:

"The use of the class-action procedure for litigation of individual claims may offer substantial advantages for named plaintiffs; it may motivate them to bring cases that for economic reasons might not be brought otherwise. * * * [T]he financial incentive that class actions offer * * * is a natural outgrowth of the increasing reliance on the 'private attorney general' for the vindication of legal rights[.]" *Deposit Guar. Natl. Bank v. Roper* (1980), 445 U.S. 326, 338, 100 S.Ct. 1166, 63 L.Ed.2d 427.

{¶ 74} Because Fred Martin's arbitration clause also does not recognize the right to proceed through a class action or as a private attorney general in arbitration, the arbitration clause as drafted clearly invades the policy considerations of the CSPA. Such a contract clause is injurious to the interests of the state, is against public policy, and accordingly cannot, and will not, be enforced. See *King*, 63 Ohio St. at 372, 59 N.E. 111. We find that the characteristics of secrecy and limitation of consumer rights found within this clause also contribute to the substantive unconscionability of the arbitration clause.

### iv. "Loser Pays" Provision

{¶ 75} Ms. Eagle also urges this court to hold the "loser pays" provision in the NAF Code of Procedure unconscionable. To support her argument, Ms. Eagle insinuates that such a provision would have the same chilling effect on a consumer as that imposed by the other arbitration costs and fees. Ohio has not adopted the loser pays rule with respect to litigation costs. See, generally, *Lee v. Pelfrey* (1996), 81 Ohio Misc.2d 52, 57, 675 N.E.2d 80. But, see, *Teamsters Local 957 v. R.W.F. Distributing Co.* (S.D.Ohio 1983), 574 F.Supp. 703, 707–708 (concluding that where an arbitration agreement requires the loser to pay the

costs of the arbitration, the arbitrator must follow the plain language of the agreement).

{¶ 76} Rule 44(E) of the NAF Code of Procedure provides that a "prevailing [p]arty may recover fees paid in the arbitration in accord with Rule 37C." Rule 37(C) states that "[a]n award may include fees and costs awarded by an Arbitrator in favor of any Party as permitted by law or in favor of the [NAF] for fees due." We note that in both these rules, the arbitrator's award of such costs and fees in favor of the winning party appears to be discretionary and not mandatory. Thus, a reading of the plain language of the NAF rules suggests that there is no steadfast loser pays rule within the NAF Code of Procedure.

{¶ 77} One can argue that there is always a chance, however slight, that a consumer may be saddled with an imposition of the opponent's costs. However, Ms. Eagle has not indicated to us any reason to believe that this probability is stronger in her particular case. Because there is not enough information in the record from which we can conclude that Ms. Eagle will face these costs with any likelihood, we cannot necessarily find that the loser pays provision, as it applies to Ms. Eagle, is unconscionable.

### E.   Failure to Provide a Copy of the Purchase Contract

{¶ 78} Ms. Eagle also asserts, in an affidavit, that Fred Martin failed to provide her with a copy of the purchase contract containing the arbitration clause after she signed it. Ms. Eagle argues that the failure to provide her with a copy of the contract constitutes a deceptive act, citing *Gross v. Spitzer Buick Co.* (Dec. 22, 1998), Summit C.P. No. CV 97 09 4942, 1998 WL 2027611, and Ohio Adm.Code 109:4–3–13(C)(15). As stated supra, R.C. 1345.02(A) states that a supplier shall not commit an "unfair or deceptive act" in connection with a consumer transaction. R.C. 1345.02(B) lists ten acts or practices that are "deceptive." We observe that the failure to provide copies of documents signed is not explicitly included in the list of ten deceptive acts in R.C. 1345.02(B), nor do any of these acts appear to apply. See, e.g., *Haines v. Key Oldsmobile Co.* (Oct. 28, 1997), 10th Dist. No. 97APE06–750, 1997 WL 677984.

{¶ 79} Ohio Adm.Code 109:4–3–16 articulates a number of deceptive and unfair acts or practices in connection with the sale or lease of motor vehicles. This section does not specify a requirement that a customer be given a copy of every document that he or she signs. Ohio Adm.Code 109:4–3–13(C)(15) does require that a customer receive a copy of any document signed or initialed by him or her, at the time that it is signed or initialed. However, this section applies only to the repair or service of a motor vehicle and not a sale as in this case. Therefore, Ms. Eagle's reliance on Ohio Adm. Code 109:4–3–13(C)(15) is misplaced, and we find no explicit requirement in the CSPA to provide a consumer with a copy of every document signed in a consumer sales transaction. However, we observe that the

common pleas court in *Gross* did find in its judgment order findings of fact and conclusions of law that the failure "to give the consumer a copy of any document signed by the consumer at the time of signing is an unfair and deceptive act or practice which violates R.C. 1345.02." *Gross*, supra.

{¶ 80} Additionally, our research reveals that the Ohio Revised Code does require that a consumer be given a copy of a purchase agreement governing a sale of a motor vehicle. R.C. Chapter 4517, which deals with retail sales, does explicitly require that the buyer be given a copy of the agreement that he signs in a motor vehicle retail or wholesale sale. R.C. 4517.26. Specifically, the version of R.C. 4517.26 in effect at the time that Ms. Eagle signed the purchase contract, provides, in relevant part, the following:

"Every retail and wholesale sale of a motor vehicle shall be preceded by a written instrument or contract that shall contain all of the agreements of the parties and shall be signed by the buyer and the seller. *The seller, upon execution of the agreement or contract and before the delivery of the motor vehicle, shall deliver to the buyer a copy of the agreement or contract*[.]" [13] (Emphasis added.)

{¶ 81} Thus, per R.C. 4517.26, a seller of a motor vehicle is expressly required to execute a written instrument *and* deliver a copy of the agreement to the buyer before delivery of the vehicle to the buyer.

{¶ 82} Furthermore, we call attention to the implications of a violation of this Revised Code section. R.C. 4517.99(A), as it read at the time of Ms. Eagle's transaction, provides that "[w]hoever violates [R.C. 4517.01 through 4517.65], for which no penalty is otherwise provided in this section, * * * is guilty of a misdemeanor of the fourth degree." As stated by R.C. 2929.21, which is cross-referenced in the notes to R.C. 4517.99, "[t]he overriding purposes of misdemeanor sentencing are to protect the public from future crime by the offender and others and to punish the offender. To achieve those purposes, the sentencing court shall consider the impact of the offense upon the victim and the need for changing the offender's behavior, rehabilitating the offender, and making restitution to the victim of the offense, the public, or the victim and the public." R.C. 2929.21(A).

{¶ 83} The purposes of misdemeanor sentencing and the considerations of the victim and the public in sentencing pursuant to such violations made by sellers of motor vehicles, incidentally, appear to reflect the remedial purposes underlying

---

13. This section states that this mandate does not apply to a casual sale of a motor vehicle. A "casual sale" is defined as "any transfer of a motor vehicle by a person *other than* a new motor vehicle dealer, used motor vehicle dealer, motor vehicle salvage dealer, * * * salesperson, motor vehicle auction owner, manufacturer, or distributor acting in the capacity of a dealer, salesperson, auction owner, manufacturer, or distributor, to a person who purchases the motor vehicle for use as a consumer." (Emphasis added.) R.C. 4517.01(O).

the CSPA as discussed. The legislature felt so strongly about the power imbalance between a buyer and seller that occurs in a sale of a motor vehicle, that it applied a misdemeanor penalty to a violation of R.C. 4517.26. While the former version of R.C. 4517.26, quoted supra, does not contain any penalty language, we note that, significantly, the legislature, by amendment effective January 1, 2004,[14] added explicitly this misdemeanor language into R.C. 4517.26.

{¶ 84} It is clear from the requirement of agreement delivery and the significant resulting penalty that failure to provide a copy of a purchase agreement in violation of R.C. 4517.26, at the least, precludes enforcement of the agreement. As such an agreement cannot be binding on a buyer, it necessarily follows that any arbitration clause in this agreement cannot bind the buyer. Any other result, in our opinion, would be inequitable.

### F.  Conclusion

{¶ 85} For all of the foregoing reasons, and in light of the various deficiencies found within the clause, this court finds that this arbitration clause is substantively and procedurally unconscionable, and therefore unenforceable in its entirety. Because of our determination that the arbitration clause is unconscionable, we further find that the trial court erred in concluding that the clause was enforceable. Additionally, we conclude that the trial court erred when it granted Fred Martin's motions to stay proceedings and compel arbitration. Ms. Eagle's CSPA claim is not properly referable to arbitration because the clause as written violates the CSPA. Therefore, we also find that the trial court abused its discretion when it granted Fred Martin's motions. See *Carter Steel & Fabricating Co.*, 126 Ohio App.3d at 254–255, 710 N.E.2d 299; *Harsco Corp.*, 122 Ohio App.3d at 410, 701 N.E.2d 1040. Accordingly, Ms. Eagle's first and second assignments of error are sustained. We reverse the common pleas court's decision granting the motions and remand this case for a jury trial on Ms. Eagle's underlying claims.

### III

{¶ 86} Ms. Eagle's first and second assignments of error are sustained. The judgment of the Summit County Court of Common Pleas is reversed, and the cause is remanded for further proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

BAIRD, P.J., concurs.

CARR, J., concurs in judgment only.

---

14.  S.B. No. 123.